## THE YOUNG AMERICA.

PUTNAM *v.* THE YOUNG AMERICA. INSURANCE CO. OF NORTH AMERICA *v.* SAME. GLADWISH and others *v.* SAME. HORRE *v.* SAME. COMMUNIPAW COAL CO. *v.* SAME.

*(District Court, S. D. New York.* May 6, 1887.)

1. MARITIME LIENS—FORMAL ARREST OF VESSEL—LIENORS WITHOUT NOTICE.

The rule that liens upon vessels cannot be acquired while they are in custody of the court is not applicable upon a formal arrest only, when the vessel, by consent of the parties, is allowed to engage in her usual business, and to incur maritime obligations towards third persons having no notice of her arrest; neither the marshal, nor any deputy, being on board, or having actual possession.

2. SAME—DAMAGE LIENS—LACHES—PRIORITIES.

Liens equalling or exceeding the whole value of the vessel should be enforced with diligence; otherwise such claims, after a comparatively short period of inactivity, will be postponed, for laches, in favor of subsequent liens of navigation acquired without notice. The rule of *The Grapeshot,* 22 Fed. Rep. 123, qualified.

3. SAME—EX DELICTO AND EX CONTRACTU—RANK—MARSHALING OF SECURITY.

By the general maritime law, liens *ex delicto* are inferior in the rank of privilege to liens *ex contractu.* A prior lien for supplies is entitled to a preference, considered as a mere question of legal rank, and independent of the equitable marshaling of securities or remedies, over a subsequent lien for damage upon the same voyage. *The Aline,* 1 W. Rob. 111, and other English cases on this subject, and the provisions of various maritime codes, considered. As to the priority of liens by collision, *quære.*

4. SAME—CASE STATED—SUPPLIES OUTRANK NEGLIGENT TOWAGE.

The tug Y. A., on the twenty-ninth of January, 1886, negligently stranded her tow, doing to the latter damage exceeding the tug's value. The libel for damages was filed February 10th, but a formal arrest only was made by the marshal, and by consent of the libelant's proctor, she was suffered to engage in her usual business about the harbor, without any keeper on board, and without publication. Upon trial the tug was held liable, and she was arrested for sale upon execution on the eighth of July. In the mean time several bills for supplies of coal were incurred, upon which liens were claimed under the maritime and state laws. *Held,* (1) that the liens for supplies furnished without notice of the libelant's suit should be sustained; (2) that the practical release of the vessel, after a formal arrest only, for the purpose of permitting her to engage in her usual business, was such laches as should postpone the libelant's liens to those of the subsequent material-men without notice of the suit or claim; but not as to supplies furnished after notice of the suit pending; (3) that the lien for supplies furnished before the stranding was prior in rank to the subsequent lien for damage for negligence in towage, which should rank with negligent damage to cargo; (4) that the damage to cargo, for which a subsequent libel was filed, should share ratably with the owner of the vessel damaged, after paying for the supply bills allowed.

In Admiralty. Distribution of proceeds.

On the tenth of February, 1886, the libel was filed in the first-named cause to recover $10,000 damages to the bark Strathay, for the alleged negligence of the tug Young America, while towing the bark, in causing her to run upon the rocks at Hell Gate on the twenty-ninth of January, 1886. Under the process issued, the marshal made a formal arrest of the tug on the tenth of February. The libelant's proctor, however, look-

ing for a settlement of the cause, and the owner not being able to give bail for the tug's release, the marshal was directed by the libelant not to tie her up, nor put a keeper on board; and she was permitted to run about the harbor in her usual business, as before. The tug was held on the trial in April following to be chargeable with negligence, (27 Fed. Rep. 562,) and the damages were assessed at $6,411.96, upon which a final decree was entered on the second of July, 1886, and the tug was sold thereunder by the marshal on the fourteenth of July, netting $2,298.85, which has been deposited in the registry of the court. On the twelfth of May, 1886, the second of the above-named libels was filed by the insurance company, which had paid the loss on the cargo on the thirty-first of March previous. The other three libels were filed on the ninth of July, a few days before the sale of the tug, to recover for supplies of coal furnished to the tug while she was running in her usual business. That of Gladwish & Co. was for $1,031, for coal furnished between March 5th and July 8th; that of Horre, for $63.05, for coal furnished between December 12 and March 1, 1886; that of the Communipaw Coal Company, $125, for coal furnished from March 12th to July 5th. Gladwish & Co. are residents of this state, where the tug belongs. They filed specifications of their claim of lien in the county clerk's office every 30 days, and claim a lien under the state law. The other two libelants are residents of New Jersey. They supplied the coal at Hoboken, and claim liens under the maritime law.

*James K. Hill, Wing & Shoudy*, for Putnam and others.

*Butler, Stillman & Hubbard*, for Insurance Co.

*Alexander & Ash*, for Gladwish and others.

*Marsh, Wilson & Wallis*, for Communipaw Coal Co.

BROWN, J. Upon the exceptions to the commissioner's report, two general questions are presented—*First*, whether the material-men acquired any lien for the supplies furnished after the vessel was arrested; and, if so, *second*, whether either of them is entitled to priority over the previous lien for negligent towage. Horre's claim presents a further question, whether a prior lien for supplies is outranked by a later lien for damage done in towing.

1. When a vessel is arrested in admiralty, under process of the court, the law requires that she be kept safely by the marshal for the benefit of the parties to the cause, and of all others who may be interested in her. It has been often held, accordingly, that the marshal has no authority to create or to permit charges upon the property beyond such as are necessary for its due care and preservation; and no claims arising while the vessel is in the custody of the court are recognized as liens strictly, though they may be paid out of the remnants. *The Sultana*, 1 Brown, Adm. 35; *The Aline*, 1 W. Rob. 112; *The Phebe*, 1 Ware, 354, 360; *The Grapeshot*, 22 Fed. Rep. 123, 125; *Merritt* v. *Merchandise*, 30 Fed. Rep. 195; *The San Jacinto*, Id. 266.

This rule rests in part upon necessity, to prevent the loss of a party's rights during the litigation. *The Witch Queen*, 3 Sawy. 17. So far as

respects the parties to the cause, the benefits of the rule may be waived; and the rule cannot properly be applied at all where, by direction of the parties, the arrest of the vessel is formal only, and is not designed to be followed by any actual possession of the marshal.

The evidence shows that in this case nothing more than a formal arrest of the vessel upon the original libel was desired; and that, by direction of the libelant's proctor, the vessel was allowed by the marshal to pursue her ordinary business as before; and that she did so, without interruption, for about five months after her first nominal arrest, on the tenth of January; that during this time there was no keeper on board, and no notice of attachment posted upon her masts; nor was there any publication of process until the latter part of May. In effect, the vessel was not in the custody of the court at all.

However kindly or economic the reasons that led to this arrangement, it involved an entire departure from the ordinary practice of the court. Such a departure must infallibly lead to entangling complications, in which either the interests of the parties to the litigation, or the interests of other persons dealing with the vessel, or suffering from her torts, must be sacrificed. It is liable to lead also to conflicts of jurisdiction. The formal seizure was, doubtless, sufficient for the jurisdiction of this court; because the arrest was lawful, and the vessel was, for the moment, in the custody and under the control of the marshal. The subsequent delivery of the vessel to the owner, though without security, did not defeat the jurisdiction of this court, nor the further continuance of the action; because clearly not made with any intent of abandoning the lien, or the right to take possession in pursuance of the original arrest at any moment afterwards. *The Rio Grande*, 23 Wall. 458, 465; *Jennings* v. *Carson*, 4 Cranch, 2; *The Brig Ann*, 9 Cranch, 289, 291. But it is, at least, a serious question whether other courts could not have maintained jurisdiction over the *res* by a seizure under execution or attachment while she was thus voluntarily suffered to run, as in the present case. In *Taylor* v. *Carryl*, 20 How. 583, 593, 599, 600, it was the actual and continuous possession and control by the sheriff or marshal of the one jurisdiction that was held to be the essential element that excluded the jurisdiction of the other from attaching; and, in the present case, such continuous possession and control were lacking. See *Miller* v. *U. S.*, 11 Wall. 268, 294.

A practice so objectionable can receive no countenance or support. The rule excluding subsequent liens cannot be extended to vessels that are not actually, as well as constructively, in the marshal's possession. Where a plaintiff, as in this case, obtains only a nominal arrest of a vessel, and virtually directs that she be left to pursue her ordinary business, with its attendant liabilities to other persons, in contract or in tort, he must be held to have waived the benefit of the custody of the court as a protection against other liens, and to be estopped from claiming, as against third persons, the exemptions that belong only to a vessel in actual custody. Otherwise, not only would third persons be misled and deceived, but ready means would be offered of running vessels without

liability to any further liens at all. Such a practice would be a plain abuse of the process of the court. For these reasons I must hold the claims of the material-men to be liens on the tug.

2. *Priority.* As there was no continuous possession by the marshal, nor any publication of the summons, as required by the rules in admiralty, until the latter part of May, there was no notice of the suit, actual or constructive, to those who dealt with the vessel in the meantime without express notice. As respects such persons giving credit to the ship in her ordinary business, the libelant Putnam can stand in no better situation, as regards priority of lien, than if he had not commenced any suit at all. The question of priority must then be determined according to the ordinary rules applicable to similar liens; treating the suit of Putnam in this case as dating, so far as affects the other lienors, at the time when express notice of it was brought home to them.

The general rule is that liens, in order to retain their priority, must be enforced with reasonable diligence, having reference to all the circumstances of the case. In *The J. W. Tucker*, 20 Fed. Rep. 129, 133, it is said: .

"As maritime liens are secret incumbrances, and tend to mislead those who subsequently trust to the ship, unless they are enforced with diligence, according to the circumstances and the existing opportunities for enforcing them, they will be deemed either abandoned through laches, as against subsequent lienors or incumbrancers, or postponed to the claims of the latter, as circumstances may require. There is no fixed rule applicable to all cases determining what shall be deemed a reasonable time, or what shall be considered laches in enforcing such liens. In ordinary ocean voyages, the preference allowed, even to bottomry, will be lost after a subsequent voyage, if reasonable opportunity previously existed for the arrest of the ship. *Blaine* v. *The Carter*, 4 Cranch, 332; *The Royal Arch*, Swab. 269–284; *The Rapid Transit*, 11 Fed. Rep. 322, 334. BETTS, J., held that the same rule should be applied to ordinary liens for supplies. *The Utility*, Blatchf. & H. 218, 225; *The Boston*, Id. 309, 327."

In nearly all the maritime codes the privileges guarantied by law, if not enforced before the departure of the vessel upon another voyage, are postponed to the liens connected with the later voyage. As the distinction by voyages could not be practically applied to water-craft plying daily about the harbor of New York without defeating the very object of maritime liens, a rule analogous to that adopted in some of the western districts was followed in the case above cited, and in *The Grapeshot*, 22 Fed. Rep. 123, 125; namely, to treat such liens acquired within a period of reasonable diligence as contemporaneous. In the case last cited, however, it was considered that the same rule of diligence might not be applicable to repairs of an extraordinary and exceptional amount, which for that reason ought to be sued for with greater diligence, as the vessel might not be able to respond for later liens. As there is no fixed time to constitute laches applicable to all circumstances, it should be determined with reference to the equitable maxim, *sic utere tuo ut alienum non lædas*,—enforce your own rights so as not to injure others. It would be in the highest degree inequitable to permit lienors like Putnam or the

insurers, in this case, who had claims far in excess of the value of the vessel, to lie still when there was daily opportunity to enforce their claims by legal proceedings, and to permit the vessel to obtain credit in daily business on her own security from innocent third persons, when the prior lienors knew, but the later lienors did not know, that the vessel could never be made to respond for a dollar of the credits thus obtained. The rule of justice and equity in such a case clearly demands that a comparatively brief period of inactivity, where there was full opportunity for attaching the vessel, should be held to constitute laches sufficient to postpone the prior lien in favor of subsequent lienors, who were thus prejudiced by the delay, and by the want of notice.

In the case of *The Frank G. Fowler*, 21 Blatchf. 410, 17 Fed. Rep. 653, where there was a difference of 19 days only between the time of the accruing of the two liens for negligence in towage, and the tug laid up each night in New Jersey, and only touched at the city of New York at night to report the work done, and there was also necessary delay in ascertaining the first lienor's damage, it was held that this delay of 19 days was not laches which should postpone the first lien to the second.

In the present case there was clearly no laches by Putnam in the commencement of the suit on the tenth of February, 12 days only after his lien accrued. But the voluntary, immediate release of the vessel from the actual possession of the marshal, for the purpose of letting her follow her ordinary business, and incur the liabilities which were to be expected in that business, constituted laches of the highest possible character, as respects subsequent lienors in good faith; since it was a practical release of the vessel after she was once in custody, to the prejudice of those who had no notice of the suit. Of course, there was no intention of any abandonment of the libelants' lien, or of an entire release or discharge of the vessel from suit; but, as respects third persons who were ignorant of the facts, it was equally to their prejudice; and in all such cases I must hold the libelant's lien postponed to the later liens that accrue in consequence of such partial release, and without notice.

As respects the claim of Gladwish & Co., there is considerable controversy as to the time when they received notice of the libelant's suit, and of the arrangement under which the tug continued to run. Under such circumstances, the burden of proof is upon the libelant Putnam to prove fair and unequivocal notice to the subsequent lienors. Upon repeated examination of the evidence, I am not satisfied that this notice was brought home to Gladwish & Co. before the twelfth of May. I think the weight of proof establishes such notice at that time. The claim of Gladwish & Co. will therefore be allowed a preference for supplies of coal furnished up to that date, with interest, which I find amounts in all to $619.49.

As respects the coal supplied by Gladwish & Co. after full notice of the facts, they are not entitled to any preference over the prior lien of Putnam; because, after full notice, they have no superior equity. They then knew that Putnam was prosecuting his suit with diligence; that he had just obtained an interlocutory decree holding the tug liable; that

there was no intent to release the tug from her obligations; and that the permission for her to run about her usual business was from willingness to inflict as little damage upon the tug-owner as possible.    Supplies furnished after knowledge of these facts must be deemed to have been furnished at the risk of the pending litigation.    *The Aline*, 1 W. Rob. 111; *The Grapeshot*, 22 Fed. Rep. 123.

No notice of the facts is brought home to the Communipaw Coal Company; and their claim for $125.70, with interest from July 5, 1886, amounting in all to $132, is also allowed a priority.

3. The claim of Horre, except as to a very small portion, was for supplies furnished before the stranding of the tow, and hence before Putnam's lien accrued.    In the case of *The Grapeshot*, 22 Fed. Rep. 123, 125, following the case of *The Samuel J. Christian*, 16 Fed. Rep. 796, it was held that a prior lien for supplies would not be postponed, in the absence of laches, to a subsequent lien arising from negligence in executing a contract of towage.    In the subsequent case of *The M. Vandercook*, 24 Fed. Rep. 472, it was held by the learned judge of the district of New Jersey, on the contrary, that damage from negligent towage took precedence of prior liens for repairs and supplies, because the damage lien was a claim founded in tort, arising *ex delicto*, and not *ex contractu;* and in support of this rule the following passage was referred to in the opinion delivered by Mr. Justice BRADLEY in the case of *The Norwich Co.* v. *Wright*, 13 Wall. 122:

"Liens for reparation for wrongs done are superior to any prior lien for money borrowed, wages, pilotage, etc.; but they stand on an equality with regard to each other, if they arise from the same cause."

This passage was cited from Maclachlan on Shipping, 598, (12th Ed. p. 703,) on account, apparently, of the pertinency of its last clause, which was applied by the supreme court, holding that another vessel and cargo damaged in the same collision should share concurrently with the owner of the cargo on board of the offending ship.    The doctrine of the former clause was not at all involved in the case, and cannot be supposed to have received the special consideration or approval of the court.    Maclachlan himself says that these damage liens "usually arise out of collision." 12th Ed. p. 703.    The paragraph that follows is ambiguous; and, though capable by the context of being limited to liens growing out of collision only, would more naturally be interpreted as applicable to all liens for wrongs done.    If this is the rule to be applied, not only to pure torts, but to *quasi* torts also, such as negligence in the execution of contracts, and wherever at common law an action on the case would lie, the rule would embrace all cases of loss or damage to goods through any negligence of ships as common carriers; negligence in the fulfillment of charter-parties; negligence in navigation, in stranding, in towage, in loading and unloading cargo, or in its stowage or distribution; and would embrace also all cases of personal injury or damage to seamen, to stevedores, or to passengers, arising from any negligence of the ship.    If liens for all these causes are to be held to outrank, as a matter of law, liens for seamen's wages, bottomry, and necessary supplies previously furnished for the same voy-

age, it will constitute a revolution in the ranking of liens as hitherto understood, and as practiced by all maritime nations; and it will often result practically in sweeping away entirely those liens which have hitherto been deemed most meritorious, and essential to the protection of commerce.

Upon examination, I am satisfied that there is no warrant in the English decisions for any such change of view, and no ground for holding that damage liens, merely as such, are entitled to any higher privilege than liens *ex contractu*. The observations upon this subject, made in some English text-books, (Williams & B. Adm. Jur. 69; 2 Kay, Shipm. 919; Abb. Shipp. 112th Ed. 633,) have been derived from some remarks and decisions by Dr. Lushington between 1850 and 1860, but go much beyond what those decisions warrant. The doctrine broached since those decisions was wholly unknown to Lord Tenterden, who, in the latest edition of his work on Shipping that was published during his life-time, says: "In proceeding against the ship *in specie*, if the value thereof be insufficient to discharge all claims upon it, the seaman's claim for his wages is preferred before all other charges." Abb. Shipp. (5th London Ed.) 484. This is not only the language of the old maritime law, but of the modern also. Sir WM. SCOTT, 1 Dod. 40, and 2 Dod. 13.

My predecessor, in the case of *The Orient*, 10 Ben. 620, in denying precedence to a lien for damage through a collision over seamen's prior wages, showed conclusively that no such rule of precedence, as a question of mere legal rank, had been adopted by Dr. Lushington, or was involved in the cases referred to, (*The Benares*, 7 Notes, Cas. Supp. 50; *The Chimera*, Coote, Adm. Pr. 121; *The Linda Flor*, Swab. 309;) but that these cases were determined upon the equitable rule of marshaling securities, where the foreign owners of the offending vessel were solvent, and could personally respond to the foreign seamen. The seamen were therefore remitted to their personal remedy against the owner, in order to prevent the only fund available to the collision claimant in England from being diminished in exoneration of the wrong-doer.

In a more recent case (1883) the English court of appeal has distinctly confirmed the view taken by Judge CHOATE in respect to the grounds of Dr. Lushington's decisions, (*The Elin*, 8 Prob. Div. 39, 129,) where, in adhering to Dr. Lushington's rule as respects the wages of seamen as against the proceeds of a foreign ship held for collision, the court says:

"It has been argued that these cases have been wrongly decided, because they break through the rule of the admiralty court in regard to priorities of maritime liens. But the Linda Flor *was decided on principles quite independent of the rule as to priorities*, which was one well understood by Dr. Lushington, and which, in deciding the case I have mentioned, *he never intended to break through.* * * *"

He did not allow the fund to be diminished by a payment of wages. "This he did, says the court, independent of any mere question of priority."

In the case of *The Linda Flor*, *supra*, Dr. Lushington observed: "This is not a case of a bankrupt owner; it will be time to consider such a case

when it arises,"—an observation very pertinent to the marshaling of securities, but wholly irrelevant to the relative legal rank of maritime liens.

In the case of *The Benares*, *supra*, the only question was whether, under the statute of limited liability of George III., requiring the owner to bring into court "the value of the ship and the freight due or to grow due," the statute meant gross freight, or whether the owner could deduct therefrom seamen's wages, commissions, etc.    Dr. Lushington there observed, (7 Notes Cas. Supp. 54:)

"I apprehend it is quite clear [under the statute] that no deduction can be made on account of the *ship* for bottomry, mortgage, pilotage, towage, or any other demand whatever.   Why should such deduction take place on account of freight?"

Whether, in connection with the law or the statutes that limit the liability of shipowners for the torts of the ship, a court of admiralty should, in the exercise of its equitable powers, remit seamen to their personal remedy against the master and owner, must depend upon the circumstances of each case, and upon quite different principles from those that determine the mere rank of liens.   In England the rule has never been applied to her own seamen, nor to her own ships; but only to cases of foreign ships having responsible owners.   It can have no application to domestic vessels, in our own forum, where the personal responsibility of the owners is equally available to both classes of lienors, except in the case of bankrupt owners; and in that case there is no superior equity in mere damage liens as such.

Only the case of *The Aline* remains.   1 W. Rob. 111.   In that case a Russian schooner, having by her own fault damaged a British bark in the English channel, put into Cowes, and was repaired, upon the master's agreement to execute a bottomry bond for the expense.   The schooner being libeled in admiralty for the previous collision, and attached and sold, Dr. Lushington held that the damage claimant was entitled to the value of the ship prior to repair, as against the man who had made the repairs without knowledge of the outstanding lien; and that the damage claimant was also entitled to the value of such repairs as were made after the arrest of the vessel and while she was in the custody of the court.   That adjudication, therefore, involved no question of the rank of *prior* bottomry or supplies, but of subsequent bottomry only. In the course of the decision, some observations were made *obiter*, as respects the relation of a prior mortgagee or bottomry bondholder to the owner of another vessel acquiring a lien for a subsequent collision.   These remarks are no doubt valuable, as suggestions from so high an authority; but they do not have the weight of an adjudication, since that question was not before the court.   It was not a subject of argument or of review, and has in fact never been adjudicated, so far as I can ascertain, in the English courts.

As respects a prior mortgagee and bottomry holder, two reasons were suggested for the preference of the subsequent lienor by collision:   *First,* that as mortgages and bottomry bonds often extend to the whole value of the ship, if the ship was not held first liable for the damage she occa-

sioned, the person receiving an injury might be wholly without remedy, especially where the damage was done, as in that case, by a *foreign vessel*, and the only available redress was by proceeding against the ship; *second*, because the damage claimant had no option to exercise, while the creditor on bottomry or mortgage had. The latter had an alternative to deal with the ship or not; the former, none. The risk of the bottomry creditor could be covered by the premium he might demand. Upon this second ground, BENEDICT, J., in the collision case of *The Pride of the Ocean*, 7 Fed. Rep. 247, postponed the prior bottomry.

These special reasons fall far short of suggesting any general rule giving a preference to all torts, *i. e.*, to *quasi* torts growing out of the negligent execution of contracts. No such general rule is hinted at. On the contrary, the chief reasons suggested would exclude all liens arising from torts growing out of negligence in the execution of contracts, and all claims by persons dealing with the offending ship; since the relations of the parties in all these latter cases are as voluntary as in the case of the creditor by bottomry. They are accompanied by the same option and alternative, whether to deal with the ship or not. The inferior *status* of the mortgage creditor has since been repeatedly adjudicated; but upon grounds wholly inapplicable to bottomry, or to any other strictly maritime lien. *The E. M. McChesney*, 8 Ben. 150, 159, 160; *The Granite State*, 1 Spr. 277; *The Charlotte Vanderbilt*, 19 Fed. Rep. 219; *The J. L. Pendergast, ante*, 717.

As between bottomry and a lien in favor of another vessel and cargo for damage by collision, surely the mere fact that the prior lien is large is no reason for degrading its rank, although it may constitute one ground of remitting the creditor to a personal action against the owner, upon the principle of marshaling securities, where the circumstances justify that course; but that is not a question of the legal rank of the liens. Nor have I ever been able to perceive in the mere difference of a voluntary and an involuntary relation of the parties to the negligent ship a satisfactory ground for postponing a prior bottomry lien. A lien being, while it lasts, in the nature of a proprietary right,—a *jus in re*,— should not be impaired, or postponed to subsequent rights, except upon some laches of the lienor, or upon some clear and undoubted equity in favor of the later claimant. Such an equity clearly arises from subsequent services or expenditures that operate for the protection of the prior interests. This principle, and the obligations of diligence in enforcing liens after a reasonable period, lie at the basis of nearly all the discriminations in the ranking of liens. But a subsequent damage lien is of no benefit to prior interests. Nor is there any laches in the bottomry creditor's permitting the ship to complete her voyage. The very object of the bottomry lien is for that purpose. The law encourages the lender on bottomry to take this security, because otherwise the voyage must be broken up, and the interests of vessel and cargo sacrificed. For his loan the law promises him a lien and satisfaction out of the ship at the close of the voyage. Where, then, is the equity of depriving him

of that lien on account of the subsequent fault of the ship towards other vessels to which the bottomry creditor owes no duty, and which he has not injured? If it could be fairly held that the bottomry creditor acted as a kind of co-proprietor in the ship, and sent her out to commit possible damage to others, and was therefore affected by her faults, the equity against the bottomry holder would be clear; but no such ground is suggested in *The Aline.* It is contrary to other English cases; and, since the case of *The Frank G. Fowler,* 17 Fed. Rep. 658, in this circuit, it cannot be here maintained.

The case of different lienors for damages by collisions on successive voyages is much stronger in this regard. The considerations favoring a postponement of the earlier to the later lien in such a case were forcibly presented by my predecessor in the case of *The Frank G. Fowler,* 8 Fed. Rep. 331. Upon appeal, however, those considerations were not approved by Mr. Justice BLATCHFORD, (17 Fed. Rep. 653,) and it was held that the first lienor, not being chargeable with laches, did nothing to waive his lien; and that as the last lien stood in no relation of benefit to the first, there was nothing in the mere fact of the second tort to postpone the lien arising out of the first. Both liens in that case arose from negligence in the execution of voluntary contracts of towage. If any equity could arise against a lienor for permitting a vessel to depart, it was more apparent in the latter case; because the prior lienor had at least some opportunity to arrest the vessel, and nothing in law prevented his doing so; while a bottomry creditor could not possibly arrest the vessel before she sailed, the very object of the lien given him being to expedite her departure on the credit and lien of the bottomry. To deprive him of his lien, or to postpone it in case of insufficiency, for a subsequent tort of the ship, is to punish him for no fault of his, and would deny him, without any corresponding advantage, the benefits of the lien guarantied to him for his advances.

The suggestion that the bottomry lender may cover his risk by the premium exacted seems to me insufficient. He may, indeed, by special contract, insure the vessel, even against a liability for negligent damage to another vessel; but this only puts him, in this respect, on a presumptive equality with the owner of the vessel injured; since all vessels are usually insured against perils of the seas, which include collision by the fault of others. So universal is the practice of maritime insurance that, looking for a general rule in the administration of justice, all vessels may be regarded as insured against damage by collision owing to the negligence of others. Practically, therefore, the question is reduced to a question between the bottomry creditor on one vessel and the insurers of the other vessel. In this aspect, the relation of each to the collision is equally voluntary; for the insurer of the ship injured receives his premium constructively, in contemplation of the precise collision that occurs. He has assumed that risk, and been paid for doing so. As between such insurers and the bottomry creditor, or the insurers of the bottomry creditor, who are usually the real parties in interest in the lit-

igation, I see no reason why the bottomry lien should be postponed. The one prior in time being without laches or fault, and not benefited by the subsequent lienor, is entitled to his prior right.

The maritime law, as embodied in the codes of the principal maritime nations from the marine ordinance of Louis XIV., downward, not only gives no support to the doctrine that damage liens are entitled to a priority over liens *ex contractu*, but affords abundant evidence to the contrary. In the ordinance of 1681, the damage claims of merchant freighters were ranged in the last rank, below the liens of seamen or material-men that accrued during the voyage or prior to departure. Express mention of damage from collision is found in comparatively few of the modern codes; but, wherever found, it is placed last in the whole order of privileges. It is so in the Code of Germany, arts. 757, 772; in the Belgian law of August 24, 1879, art. 4, § 17; in the Norwegian Code, arts. 79, 101. The new Italian Code, § 661, makes the demand a charge on the ship, but apparently after all other privileges, (section 675.) In the French Projet de 1867, specific provision was made for damage interests arising from collision, and they were placed last; namely, in the fifteenth rank.

The justice of this low rank of collision claims, as a general rule, seems to me obvious; since injury from collision by the faults of other vessels is one of the ordinary risks of navigation. As such, it is insurable, and is usually covered by insurance. All vessels, by the premiums paid for insurance, contribute to pay for such losses; and the underwriters, upon a deficiency of proceeds to pay all the claims upon a vessel, should therefore rank after other claimants, who are not thus covered, or capable of being similarly protected. Many of the maritime codes of Europe, like that of France, give no special privilege upon the ship for damages by collision. Redress is obtained by suit against the master and owner, who are held for the whole damage, except upon the surrender of the value of the ship and freight, taking no account of any lien arising *ex contractu*. Valin, Comm. L. 3, T. 7, art. 10; Emerigon, 1, 418; 5 Desjardins, Droit Com. Mar. 93.

For these reasons I should hesitate long, in a case not presenting any additional grounds for the equitable marshaling of remedies, before according any preference to a collision lien over a lien for bottomry, or for necessary supplies, which hold the same rank as bottomry. But, however the relative rank of collision liens may be ultimately determined, I find nowhere in the general maritime law any countenance to a priority of liens for mere *quasi* torts, such as negligence in the execution of contracts. The relative rank of such liens in the judgment of the general maritime law is sufficiently indicated by the place assigned to one of the most frequent and important of this class of torts, namely, that arising from the loss or injury of the shipper's goods by the fault of the ship. The rank of such claims is expressly determined by a great number of codes, from the ordinance of 1681 downward. It is mentioned in almost every modern code, and in every case has a lower rank than wages, bottomry, or necessary supplies for the voyage. French Code de Com. art. 191, § 11; German Code, art. 772, § 4; Netherlands Code, § 313, subd.

10; Italian Code, § 674, subd. 11; and numerous others, including the Codes of Belgium, Spain, Portugal, the Argentine Republic, Egypt, Chili, and Brazil, referred to by Desjardins in Droit Com. Mar. vol. 1, p. 292, §§ 156–158.

None of these codes, so far as I can ascertain, make any express mention of damage sustained by a vessel, or her cargo, when in tow of another, and where, as in this case, the damage has happened through the fault of the tug. But it is plain, I think, that the rights of the tow and of her cargo-owners, as against the tug, or as against any lienor of the tug, are no greater than would exist if the property damaged were actually on board the tug. Where the tow is completely under the control and management of the tug, the case, as respects the point under consideration, is perfectly analogous to injury of cargo on board the guilty ship. The owners of the tow, in engaging towage, voluntarily put the tow in charge of the tug as completely as the cargo-owner does his goods when he puts them on board. His implied security is the value of the vessel as she is, with no right to postpone prior maritime lienors who are not guilty of laches or fault. The same rank in order of preference should therefore be assigned to injuries to the tow as to injuries to goods on board the offending vessel; and this, as we have seen, is posterior to liens for supplies, where no laches exists.

In the absence of any controlling authority, or of any sound reason for a different rule, this almost universal law of the maritime world should be followed as the undoubted expression of what is most just and equitable; and, as no laches is imputable to Horre in respect of his claim for supplies to the tug, the decision in the case of *The Grapeshot*, *supra*, should be adhered to, and his claim allowed a priority over the damage liens.

The insurers, the libelants in the second of the above cases, have no greater rights than the owners of the cargo insured. *Phœnix Ins. Co. v. Erie & Western Transp. Co.*, 117 U. S. 312, 6 Sup. Ct. Rep. 750, 1176; *The Bristol*, 29 Fed. Rep. 867, 870. Both had early knowledge of all the facts. The proof leaves no doubt that the insurers were in fact waiting on the action of Putnam, the original libelant. Their libel was not filed until after the decision in his favor upon the merits of the stranding. The insurers and the libelant Putnam will therefore share ratably in the residue, after payment of the claims of the material-men to the extent above allowed.

Decrees may be entered accordingly.