10 F.3d 176
 1994 A.M.C. 879
 OIL SHIPPING (BUNKERING) B.V.; Baytur Trading S.A.; The
Royal Bank of Scotland PLC; Tramp Oil Corporation;
Pennsylvania Ship Supply Co., Inc.; International Marine
Fuels of San Francisco, Inc.; Tramp Oil and Marine Limited;
Bridge Oil Limited; Moran Towing of Pennsylvania, Inc.
v.
SONMEZ DENIZCILIK VE TICARET A.S.; M/V Ziya S, her engines,
boilers, tackle, etc.; Northwest Shipping
Corporation; K. Dan Dalkiran,
International Marine Fuels of San Francisco, Inc., Appellant.
 No. 93-1342.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 8, 1993.
Decided Nov. 30, 1993.
 
 Mary Elisa Reeves, Krusen, Evans & Byrne, Philadelphia, PA, Charles S. Donovan (argued), Elizabeth M. Miller, Walsh, Donovan, Lindh & Keech, San Francisco, CA, for appellant.
 Henry C. Lucas, III (argued), Matthew P. Harrington (argued), Rawle & Henderson, Philadelphia, PA, for appellee The Royal Bank of Scotland plc.
 Before: HUTCHINSON, COWEN and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellant, International Marine Fuels of San Francisco, Inc. ("IMF"), appeals an order of the United States District Court for the Eastern District of Pennsylvania disposing of lien claims on a fund created by the judicial sale of the vessel M/V ZIYA S ("ZIYA S") and its bunkers.[1] See Oil Shipping (Bunkering) B.V. v. Royal Bank of Scot. plc, 817 F.Supp. 1254 (E.D.Pa.1993). In that order the district court held IMF, which had supplied fuel bunkers after the ZIYA S had been arrested, did not have a preferred claim or lien superior to that of appellee. The Royal Bank of Scotland plc ("Bank"), for the value of the bunkers. Id. at 1260-61.
 
 
 2
 The district court had subject matter jurisdiction over this admiralty action pursuant to 28 U.S.C.A. Sec. 1333 (West 1993). We have appellate jurisdiction over the final order of the district court pursuant to 28 U.S.C.A. Sec. 1291 (West 1993).
 
 
 3
 IMF contends that the arrest of the ZIYA S was merely "nominal" and therefore the vessel could continue to incur obligations. IMF also argues it had no duty to inquire as to the status or custody of the ship under the Federal Maritime Lien Act. In the alternative, IMF argues that the fuel it provided to the ship was an in custodia legis expense because it was for the common benefit of the vessel's creditors and that the district court therefore abused its discretion when it refused IMF's claim to priority in the proceeds from a separate sale of the fuel. Finally, IMF argues that the district court erred in awarding the proceeds of the sale of the bunkers to the Bank because the Bank's lien did not extend to the bunkers.
 
 
 4
 We reject these arguments. We hold that the district court and the United States Marshals Service did not nominally arrest the ZIYA S, but rather effectively put her in custodia legis. Because no private party can bind a vessel in custodia legis, we also conclude the Federal Maritime Lien Act's presumption that a party ordering supplies for a vessel has authority to bind her does not apply once the vessel is in court custody. In addition, we hold that the district court did not abuse its discretion in denying IMF's claim priority as an administrative expense incurred while the vessel was in custodia legis. Finally, in accord with long standing principles of maritime law, we hold that the Bank's lien reached the fuel IMF supplied. We will therefore affirm the order of the district court.
 
 I.
 
 5
 On March 27, 1992, IMF confirmed in writing its assent to an order from the operator of the vessel the ZIYA S, Sonmez Denizcilik Ve Ticaret A.S. ("Sonmez"), Istanbul, Turkey, to provide fuel bunkers to the vessel when she was moored in the Port of Philadelphia. Under the terms of this agreement, the delivery was to take place at 8:00 a.m., March 30 at Pier 122. On March 27, IMF bought the fuel needed to meet the agreement from Texaco International Trade Inc. and Texaco arranged for a towing barge to deliver the fuel on the morning of Monday, March 30, as agreed. The contract price of the bunkers as ultimately delivered was $200,781.31.
 
 
 6
 In the meantime, on March 27, 1992, Oil Shipping (Bunkering) B.V., a previous supplier of the ZIYA S, had filed an in rem and in personam claim against the ZIYA S, her owners, and managers, in the United States District Court for the Eastern District of Pennsylvania, seeking funds due for bunkering supplied overseas. On March 29, pursuant to a warrant issued by the district court, the United States Marshal ("Marshal") arrested the ZIYA S while she was berthed at Pier 122 in the Port of Philadelphia. The Marshal served the master of the ship with a complaint and posted a copy of the arrest notice on the ship's wheel house. The Marshal then appointed the master of the ship substitute custodian. By order of the district court, the ZIYA S was permitted to continue off-loading cargo, but the district court ordered her to remain within the jurisdiction of the court. A later court order permitted the vessel to move to Pier 82 South.
 
 
 7
 The next morning, March 30, 1992, the barge arrived carrying the IMF bunkers. The master accepted the fuel on board. The barge captain met with the chief engineer of the ZIYA S who signed a declaration of inspection. The barge transferred the bunkers from approximately 10:00 a.m. to 5:25 p.m. Although the master was well aware of the arrest of the vessel, he never informed the barge captain or crew. The barge delivered 2,185.23 metric tons of bunker fuel and 122.18 metric tons of marine diesel oil to the vessel. At the time of delivery, the ZIYA S already had at least 433.1 metric tons of fuel and 86.9 metric tons of diesel aboard. Following the completion of the delivery, the barge left the ZIYA S. IMF had no actual knowledge of the arrest and did not become aware of it until April 29, 1992, one month later.
 
 
 8
 On April 2, 1992, the Bank, the holder of a first preferred ship mortgage on the ZIYA S, seeking to foreclose on its mortgage, intervened in the action. Shortly thereafter, the Bank received its own arrest warrant and executed it upon the vessel. The mortgage had been granted and properly recorded following the advance of $11,000,000.00 from the Bank to the vessel owners and operators.
 
 
 9
 On May 12, 1992, the Marshal sold the ZIYA S at public auction for $1,820,000.00. The sale included the fuel on board at the time of initial arrest but not that supplied by IMF. A few days later, the IMF bunkers were sold at private sale to the successful bidder of the ship for $130,000.00. The district court ordered the proceeds from both sales held in a single fund.
 
 
 10
 All claims to the fund except those of IMF, the Bank, and one other party were settled by stipulation after all had made cross-motions for summary judgment with respect to the priorities of their respective liens. In its April 6, 1993, order, the district court granted the Bank's motion and awarded it the remaining funds in the court registry. IMF filed a timely appeal.
 
 II.
 
 11
 We will separately address all three of IMF's contentions.
 
 A.
 
 12
 It is well settled that once a vessel is under arrest and in judicial custody, her owners and master of the ship no longer have any power to bind her and create a lien.[2] Kingstate Oil v. M/V GREEN STAR, 815 F.2d 918, 922-24 (3d Cir.1987).
 
 
 13
 When a vessel is in the custody of the law, having been seized by the marshal, and being either in his actual or constructive possession, no new liens against her may accure [sic], and neither the marshal, the master, nor the owner has the power to impose a lien of any sort beyond such as are necessary for the ship's due care and preservation. Since the seizure revokes all authority to incur liabilities on behalf of the ship, one who renders services without first requiring the Court's permission, does so at his risk.
 
 
 14
 2 Benedict on Admiralty Sec. 48 at 3-92 to 3-93 (footnotes omitted) (7th ed. 1990). Courts considering this rule have, however, noted that it is not without exception. If the arrest of the vessel is "nominal" and she continues to conduct normal business operations, parties that innocently supply materials to her will not have their liens defeated by virtue of the arrest. See id. at 3-96 ("In order for the vessel to avoid liens while in custodia legis, the possession by the marshal must be actual or constructive and not merely nominal or colorable." citing Taylor v. Carryl, 61 U.S. (20 How.) 583, 15 L.Ed. 1028 (1858) (other citations omitted)). The case most often relied upon for the nominal arrest theory is THE YOUNG AMERICA, 30 F. 789 (S.D.N.Y.1889). In that case, it stated:
 
 
 15
 the vessel was allowed by the marshal to pursue her ordinary business as before; and that she did so, without interruption, for about five months after her first nominal arrest ... [and] that during this time there was no keeper on board, and no notice of attachment posted upon her masts; nor was there any publication of process until the latter part of May. In effect, the vessel was not in the custody of the court at all.
 
 Id. at 791. The court concluded:
 
 16
 [w]here a plaintiff, as in this case, obtains only a nominal arrest of a vessel, and virtually directs that she be left to pursue her ordinary business, with its attendant liabilities to other persons, in contract or in tort, he must be held to have waived the benefit of the custody of the court as a protection against other liens, and to be estopped from claiming, as against third persons, the exemptions that belong only to a vessel in actual custody. Otherwise, not only would third persons be misled and deceived, but ready means would be offered of running vessels without liability to any further liens at all. Such a practice would be a plain abuse of the process of the court.
 
 
 17
 Id. at 791-92; see also THE NISSEQOGUE, 280 F. 174, 186 (E.D.N.C.1922) (where arrested vessel is not monitored by representative on board or notice of the arrest is not posted on board or elsewhere publicly, post-arrest repairer may obtain lien).
 
 
 18
 Innocent supply alone is insufficient to give a supplier lien status. In THE COMMACK, 8 F.2d 151 (S.D.Fla.1925), the supplier provided materials to an arrested vessel that had a keeper on board. The supplier contended that a lien should attach because the master did not reveal the arrest, but the court rejected the supplier's lien claim, stating it knew of "no principle of law which makes it the duty of the custodian to notify parties dealing with the master that he is custodian...." Id. at 153.
 
 
 19
 We hold the arrest of the ZIYA S was more than nominal. The Marshal had posted notice of arrest in the wheel house of the ZIYA S. The Supreme Court has noted the paramount importance of notice.
 
 
 20
 The whole world, it is said, are parties in an admiralty cause; and, therefore, the whole world is bound by the decision. The reason on which this dictum is based will determine its extent. Every person may make himself a party, and appeal from the sentence; but notice of the controversy is necessary in order to become a party, and it is a principle of natural justice, of universal obligation, that before the rights of an individual be bound by a judicial sentence, he shall have notice, either actual or implied, of the proceedings against him. Where these proceedings are against the person, notice is served personally, or by publication; where they are in rem, notice is served upon the thing itself. This is necessarily notice to all those who have any interest in the thing, and is reasonable because it is necessary, and because it is a part of common prudence for all those who have any interest in it, to guard that interest by person who are in a situation to protect it. Every person, therefore, who could assert any title to THE MARY, has constructive notice of her seizure, and may fairly be considered as a party to the libel.
 
 
 21
 THE MARY, 13 U.S. 126, 144, 3 L.Ed. 678 (1815). It has long been a maritime tradition to post notice of arrest on the ship. In former times, it was tacked to the mast. See, e.g., THE YOUNG AMERICA, 30 F. at 791. Today it is posted on the wheel house. See U.S. Dep't of Justice, Manual for United States Marshals, Sec. 6.3-12 (1986), reprinted in 1987 A.M.C. 1051, 1053. When the Marshal posted his handbill on the ZIYA S's wheel house, he gave constructive notice of the arrest to the whole world. The district court took other significant steps to secure the res: it appointed a caretaker, posted notice of attachment, ordered the ship not to move about the port without notice to the plaintiff, and otherwise limited the vessel's actions. The Marshal's arrest of the ZIYA S was actual, not "nominal" or merely colorable. Accordingly, when IMF delivered its fuel to the vessel, no maritime lien attached in its favor. GREEN STAR, 815 F.2d at 922. THE YOUNG AMERICA and THE NISSEQOGUE are distinguishable.
 
 
 22
 The equitable considerations underlying the court's decision in The YOUNG AMERICA are not present here. There, the court expressed concern about the risk of plaintiffs' manipulating the system by having a ship arrested, allowing her to incur liabilities as if the arrest had never happened, and then avoid paying them. This risk is not present here. The YOUNG AMERICA court's concerns are implicated only if it is the arresting party (or some other party seeking payment from the court's fund) who has allowed the liability to be incurred. See The COMMACK, 8 F.2d at 152 (finding nominal arrest exception inapplicable to case where "there was no act of libelant which induced the [suppliers] to expend the labor or furnish the supplies to the vessel...."). As the court in The COMMACK stated, "the acts of the master cannot raise an equity in favor of the [suppliers], entitling them to postpone the payment of intervenors who under the admiralty law are entitled to maritime liens. The acts of the intervenors might have this effect, but not those of the Master, owner or officers of the Court." Id. at 153 (emphasis added).
 
 
 23
 IMF contends, however, that the 1971 amendments to the Federal Maritime Lien Act ("the lien act") indicate it no longer has any duty to ascertain the status of the ship receiving supplies and therefore could provide services with impunity, absent actual notice of the arrest. We disagree for the following reasons.
 
 
 24
 Before 1971, the lien act imposed a duty on a supplier who asserted a maritime lien to use "reasonable diligence" to determine whether the individual requesting the supplies had authority to bind the ship. 46 U.S.C.A. Sec. 973 (amended 1971). Congress amended this part of the lien act to deal with a problem significantly different from that now before us, one which commonly arose when an operator of a ship was acting under charters that had a lien preclusion clause. The legislative history of the lien act amendments specifically states that they were designed to protect materialman from the harsh effect of lien preclusion clauses. It states, in relevant part:
 
 
 25
 The purpose of the [lien act amendments] is to protect terminal operators, ... ship repairers, ... and other suppliers who in good faith furnish necessaries to a vessel. At the present time, a "prohibition of lien" clause ... and the [lien act] preclude a supplier from acquiring a lien on a vessel for necessaries furnished to the vessel. The bill would amend the [lien act] to permit a supplier to acquire such a lien despite a "prohibition of lien" clause....
 
 
 26
 H.R.Rep. No. 92-340, 92d Cong., 1st Sess., reprinted in 1971 U.S.C.C.A.N. 1363, 1363. The House Report concludes: "the bill ... is necessary in order to protect American materialmen from the operation of a 'no lien provision....' " Id., reprinted in 1971 U.S.C.C.A.N. at 1365.
 
 
 27
 Gulf Oil Trading Co. v. M/V CARIBE MAR, 757 F.2d 743 (5th Cir.1985) provides a good overview of the legislative history behind the 1971 amendments. In that case, the charter agreement specifically denied the operator of the vessel the authority to incur a lien binding the vessel. The charterer, however, entered into a bunker agreement which contained a clause permitting the Gulf Oil Trading Company ("Gulf Oil"), the bunker provider, to retain a lien against the vessel for the purchase price of the bunkers. Id. at 745. Two bunker deliveries were made. At the time of the first, the master of the ship notified the barge master of the lien preclusion clause, but did not directly notify Gulf Oil. Before the second delivery, however, Gulf Oil did receive notice of the lien preclusion clause. Despite this, Gulf Oil delivered the bunkers. Id. at 746.
 
 
 28
 Later, Gulf Oil instituted an in rem proceeding, seeking to secure payment for the bunkers. Id. The district court held that while a valid maritime lien existed for the first bunker delivery, no maritime lien existed for the second delivery because Gulf Oil, at that time, had notice of the lien preclusion clause. Id. On appeal, the United States Court of Appeals for the Fifth Circuit affirmed. It rejected Gulf Oil's argument that the lien act amendments made a lien preclusion clause wholly ineffective to deprive a materialman from obtaining a lien. Id. In so doing the court of appeals reviewed the history of the 1971 amendments. It indicated that the 1971 amendments removed the duty of suppliers or materialmen to assure themselves that the operator ordering supplies for the vessel had authority to bind her. Id. It concluded, however, that the amendments did not create a conclusive presumption that an operator always had power to bind the vessel. Instead, the court concluded that no lien for necessaries could attach if the materialman had actual notice of a lien preclusion clause. Id. at 748-49.
 
 
 29
 Both legislative history and case law interpreting the 1971 amendments to the lien act indicate that they do no more than relieve a materialman of any duty to ascertain whether a lien preclusion clause is in place.
 
 
 30
 In a case involving a vessel free to go about its business, some party always exists with authority to bind the vessel even if the owner may have withheld it from the operator. Even a non-consenting owner of a vessel arguably receives a benefit from the supply of necessaries to her because it facilitates the charter. But in the case of a properly arrested vessel, no party has authority to bind the ship without permission of the court. See GREEN STAR, 815 F.2d at 922; 2 Benedict on Admiralty Sec. 48, 13-92. A supplier dealing with an arrested vessel is in a different position than a supplier dealing with a vessel under charter. Suppliers do not have to inquire about authority under the lien act because someone, somewhere, owner or operator, can encumber the vessel without obtaining court permission. In the 1971 amendments, Congress reallocated the burden of inquiry by allowing a lien in favor of a supplier who does not inquire about the operator's authority. Once a ship is under arrest, no lien can be created without court permission. We conclude that in the 1971 amendments to the lien act, Congress did not intend to give a supplier a right to rely on the authority of the master of the ship to create a lien once arrest of the vessel terminated the authority of owner, operator, charter party or anyone else to impose a lien on the vessel absent court approval.
 
 
 31
 IMF's suggested approach would grant masters and shipowners power to create liens in favor of suppliers even though all private parties have been deprived of that power. Such a power would prevent the arrest from achieving its purpose of freezing the lien positions pending court determination of their existence and priority. IMF cites no authority that would support its expansive interpretation of the 1971 amendment. Given the circumstances under which Congress amended the lien act, we think the extension IMF suggests is inappropriate. Once the vessel is properly in custody, only the court that has issued the process arresting the vessel can bind her and give a claim for supplies lien status. Suppliers who do not get court permission to supply goods to an arrested vessel act at their own peril. IMF would extend the 1971 amendments to relieve a materialman of the duty to inquire as to whether a vessel has been arrested. We do not think Congress intended that result.
 
 B.
 
 32
 Secondly, IMF contends that the district court abused its discretion[3] when it refused to give IMF's claim for the value of the bunkers it delivered the priority status of an in custodia legis expense. Priority for goods supplied in custodia legis does not technically flow from any maritime lien, see Benedict on Admiralty Sec. 48, at 3-93, but instead is based upon the equitable powers of a court administering a res.
 
 
 33
 The most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an "expense of justice." This is the familiar rule of courts of equity.... Such preferential payments ... result rather from the self-imposed duty of the court, in the exercise of its accustomed jurisdiction, to require that expenses which have contributed either to the preservation or creation of the fund in its custody shall be paid before a general distribution among those entitled to receive it.
 
 
 34
 New York Dock Co. v. Steamship POZNAN ("THE POZNAN "), 274 U.S. 117, 121, 47 S.Ct. 482, 484, 71 L.Ed. 955 (1927) (citations omitted). In order to qualify for preferential treatment as an expense in custodia legis, an expense must be incurred "upon the authority of the court or its officer," and be "for the common benefit of those interested in [the] fund." GREEN STAR, 815 F.2d at 923 (quoting THE POZNAN, 274 U.S. at 121, 47 S.Ct. at 484). Even if it were possible to infer from the master's authorization, as court appointed custodian, that the court approved the tug's delivery to off-load IMF's bunkers,[4] IMF's argument that it is entitled to administrative priority because the fuel was delivered in custodia legis would fail. It has not demonstrated that the bunkers were supplied in order for the common benefit of all the parties interested in the res or its proceeds.
 
 
 35
 Expenses furnished in custodia legis are allowed administrative priority because they are necessary to preserve the res, and it is in the best interest of all creditors that the res be preserved. Without a guarantee of priority, suppliers would be hesitant to supply goods and services necessary to preserve a res that is the subject of pending judicial proceedings. See THE POZNAN, 274 U.S. at 121, 47 S.Ct. at 484 (acknowledging the tradition of courts to elevate administrative expenses); cf. 11 U.S.C.A. Sec. 507(a)(1) (West 1993) (granting priority to administrative expenses in bankruptcy proceeding); 11 U.S.C.A. Sec. 506(c) (West 1993) (allowing trustee in bankruptcy to recover from property securing an allowed secured claim the expenses incurred in preserving the property). Here, the district court found that the fuel IMF supplied was not necessary to the preservation of the ZIYA S. We see no basis for overturning that finding. When IMF delivered its fuel and diesel oil to the ZIYA S, she already had more than enough fuel to maneuver around the Port of Philadelphia in the limited fashion the court had allowed. The bunkers supplied did nothing to preserve the res or make possible continued operation to enhance the funds available to creditors. Cf. Roy v. M/V KATERI TEK, 238 F.Supp. 813, 815 (E.D.La.1965) (administrative expense for fuel and ice allowed when vessel was under court permission to continue operation in order to supplement fund for creditors); The NEBRASKA, 61 F. 514, 516 (D.Ill.1894) (claim of fuel supplier allowed only in proportion to extent fuel permitted ship to engage in activity that would enhance the resulting fund), aff'd, 69 F. 1009 (7th Cir.1895).
 
 
 36
 The fact that the fuel IMF supplied did ultimately increase the fund available to lien creditors after the bunkers were separately sold is not enough to give IMF priority. The class of administrative expenses for goods supplied in custodia legis is not broad enough to include every post-arrest expense that might add to the value of the res when it is sold. Where the district court has not specifically ordered goods or services, only those expenses that are necessary to preserve the value of the res are in the category of in custodia legis expenses.[5] Inclusion of every valuable post-arrest supply in the category of administrative expenses would prefer the interests of suppliers whose provisions may not be immediately consumed, such as fuel or equipment suppliers, over those who provide an essential service, such as stevedores, or the suppliers of necessary consumable provisions, such as caterers. The suppliers of durable, or unconsumed, goods could then claim the proceeds of the sale of any tangibles they had supplied which were still on board unconsumed at the time of sale, while the priority of those supplying services or consumables would gradually disappear as their services or supplies were consumed. Classification of an item supplied after arrest as an in custodia legis expense depends not only on whether it inured to the benefit of the claimants but also on whether it preserved the res. Each is necessary, but each alone is not necessary and sufficient. Here, the bunkers IMF provided did not preserve the res nor enable the vessel to continue about its court directed activity as in KATERI TEK. While fuel and oil may, in certain circumstances, be necessities for which priority is appropriate, a court does not abuse its discretion when it refuses administrative priority to an expense for fuel that is neither necessary to preserve the res nor ordered by the court. The district court did not abuse its discretion in denying IMF's claim, for the value of the oil it supplied, the administrative priority of an in custodia legis expense.
 
 C.
 
 37
 Finally, IMF contends that the lien of the Bank does not extend to the bunkers, and that therefore it is entitled to the proceeds from the separate sale of the bunkers. The crux of IMF's argument is that the Bank's mortgage only extends to bunkers purchased or ordered by Northwest Shipping Corporation ("Northwest"), the owner of the ZIYA S, and that the lien created by the mortgage cannot be considered to extend to IMF's bunkers because they were ordered by Sonmez, the operator of the vessel. We also reject this argument.
 
 
 38
 IMF notes that the mortgage says that it attaches to the "Ship." The mortgage defines the "Ship" to include "any interest therein and her engines ... fuel ... and appurtenances whether on board or ashore and whether now owned or hereafter acquired...." Joint Appendix at 823. IMF would infer from the provisions that the mortgage only attaches to fuel "owned or acquired" by Northwest. Brief for Appellee at 24. We are unable to read the mortgage this narrowly. Rather we take the text on its face to mean that the mortgage extends to fuel on board the ZIYA S, and we see no language which would limit the fuel that is covered to fuel obtained in a specific manner. Cf. Payne v. SS TROPIC BREEZE, 274 F.Supp. 324, 330 (D.P.R.) ("The fact that the property is owned by the charterer and not the shipowner does not prevent maritime liens from attaching."), rev'd on other grounds, 412 F.2d 707 (1st Cir.1967).
 
 
 39
 When the Bank arrested the ship on April 15, 1992, IMF's bunkers were already in the ZIYA S's fuel tanks. The arrest of a ship arrests not only the hull and its equipment but also supplies on board. They too are part of the res. Turner v. United States, 27 F.2d 134, 136 (2d Cir.1928) (indicating that even where equipment and the vessel have different owners, the equipment is a part of the overall res subject to tort damages). The fuel aboard the ZIYA S at the time the Bank arrested her became a part of the res when it was delivered and it was no longer severable or removable by IMF thereafter. See Payne v. SS TROPIC BREEZE, 412 F.2d 707, 708 (1st Cir.1969) (assuming fuel oil was part of vessel); Moore v. Martin Marine Transp. Co., 177 F.2d 561, 563 (4th Cir.1949) (fuel oil passes with sale of ship because of its essential nature to the ship's normal function); Payne, 274 F.Supp. at 332-33 (fuel is part of vessel); In re Logan, 57 B.R. 901, 907-08 (Bankr.N.D.Miss.1986) (fuel is "integral part of the vessel" and subject to preferred ship mortgage after foreclosure). IMF's fuel, like other such items separately provided, became part of the res, thus subject to the Bank's arrest and its lien.
 
 
 40
 Finally, we conclude IMF cannot rely on the separate sale of its bunkers as evidence that the bank's lien did not reach them on this record. The separate sale resulted from the timing of the service of IMF's own writ of attachment, not from any recognition by the court or the parties that IMF's interest in the fuel was distinct from other claimants. IMF presented its writ to the Marshal minutes before the sale of the ship on May 12. At that time, buyers had traveled from around the world to Philadelphia to bid on the ZIYA S. In order to avoid interference with the auction, the Bank and other intervenors permitted the auction to go forward with the parties' respective rights to the proceeds of the ultimate sale of the bunkers preserved. It is a long standing rule in maritime actions that persons who have provided a vessel with goods that are severable from her cannot dismember her by removing them after her seizure. See, e.g., THE HOPE, 191 F. 243, 246 (D.Mass.1911) (ship's engine and netting part of vessel not removable for purpose of satisfying lien); THE FROLIC, 148 F. 921 (D.R.I.1906) (chronometer rented from third party part of vessel at condemnation sale not removable by its lienor). The district court did not err in holding similarly.
 
 
 41
 For all these reasons, we will affirm the district court's order granting the Bank's priority in the fund resulting from the sale of the ZIYA S. and denying the priority claimed by IMF.
 
 
 
 [1]
 A separate appeal, filed at our Docket No. 93-1341, also involves the same arrest of the ZIYA S but presents distinct legal issues. We will resolve that appeal by way of another opinion
 
 
 [2]
 Absent arrest, a supplier who provides "necessaries" which were ordered or authorized by the owner of the vessel, relying on the vessel's credit, obtains a maritime lien against the ship. See generally 46 U.S.C.A. Secs. 31341-31342 (West.Supp.1993)
 
 
 [3]
 We disturb district court decisions deciding what claims are accorded the status of administrative expenses incurred in custodia legis only if the " 'judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria or procedures are used.' " GREEN STAR, 815 F.2d at 922 (quoting Evans v. Buchanan, 555 F.2d 373, 378 (3d Cir.), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977))
 
 
 [4]
 While we do not decide this issue, we note the lack of any evidence beyond the marshal's instructions to the master to support this inference
 
 
 [5]
 We do not reach or decide whether goods that are not necessary to preserve the res are entitled to the priority of an administrative expense if the district court directly requests a supplier to furnish them. In that case, principles of equity need to be applied to the issue of priority. Here the district court did not request or specifically approve IMF's delivery of the fuel. The temporary custodian, lacking authority, permitted IMF to deliver the fuel and IMF failed to inquire into his authority. Acquiescence in delivery does not create a priority claim. See Vlavianos v. The CYPRESS, 171 F.2d 435, 438 (4th Cir.1948) (no priority expense for post-arrest crew wages; although "crew remained on board with the acquiescence of the marshal ... it is clear that the marshal did not ask them to maintain the vessel...."), cert. denied, 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732 (1949)