## THE F. W. VOSBURGH.

### THE DR. J. P. WHITBECK.

(District Court, E. D. New York. April 8, 1899.)

1. MARITIME LIENS — POSTPONEMENT BY LACHES — FAILURE TO ISSUE PROCESS ON LIBEL FILED.

The delay of a libelant in rem in having process issued for the seizure of the libeled vessel after the filing of his libel, by which the vessel is allowed to pursue her ordinary business, constitutes laches, as against persons who thereafter and before her seizure furnish supplies to the vessel in good faith, and postpones his lien to theirs.

2. SAME — RIGHTS OF CO-DEFENDANT.

A libelant entitled to recover damages for an injury against two vessels as joint and several wrongdoers may elect to proceed against either or both; and hence, where he joins both in his libel, his failure to issue process against one does not constitute laches of which the other can complain, though it is compelled by reason of such fact and the consequent intervention of other liens against its co-defendant to bear more than its just proportion of the recovery.

On Application for Distribution of Fund Arising from Sale of Libeled Vessels.

James J. Macklin, for libelant.

Goodrich, Deady & Goodrich and Alexander & Ash, for subsequent lienors.

Carpenter & Park, for the F. W. Vosburgh.

THOMAS, District Judge. Heretofore a decree of this court determined that the two tugs Vosburgh and Whitbeck were equally in fault for the collision resulting in injury to the libelant's barge, and payment of one-half damages and costs was awarded primarily against each tug, with a right of recourse to the other in the case of the insufficiency of one tug to meet its share. The collision occurred on the 19th day of December, 1892. A libel in rem was filed against both tugs on March 30, 1893. The Vosburgh voluntarily appeared and bonded, but the Whitbeck was not seized until July 7, 1893, and then only on an order of the court made at the instance of the Vosburgh.

The Vosburgh gave a stipulation for value, but the Whitbeck was sold, and the remnants of the proceeds of sale applicable to the payment of decrees, to wit, $586.41, are in the registry of the court, from which the libelant asks payment of one-half of the decree ordered to be paid by the Whitbeck. At this juncture, several lienors allege that their claims are liens upon the fund prior in right to that growing out of the collision, on account of the laches of the libelant in the seizure of the Whitbeck; and it is the solution of this question that now engages the court. The claims for supplies furnished the Whitbeck, for which such priority is asserted, are those of Offerman, $364 for coal; Sullivan, $97.41 for repairs; and Horre, $25.60 for coal. These supplies and repairs were all furnished during the year 1893, subsequently to the date of the collision, which was December 19, 1892, and to the date of the filing of the claim for collision, which was March 30, 1893, except Sullivan's account, which extends from November, 1892, to May, 1893. Process upon the claim for collision was issued July 7, 1893, subsequently to the accruing of the other claims, but prior to the filing of the libel for such other claims in this court. It will be observed that, although the libel for the collision was filed March 30, 1893, the application for process to issue was allowed to lie until July 7th of that year. The obvious purpose of this was to allow the tug Whitbeck to continue its operation in the harbor, either with or without an agreement with her owner respecting the matter. In other words, after waiting from the date of the collision, December 19, 1892, to March 30, 1893, for the institution of a suit, the libelant did on the latter date invoke the intervention of the law by filing his libel, and then failed to apply for process for the space of three months, and during this time the libelant permitted the tug to be operated, whereby persons were influenced to aid her navigation by such supplies as her use demanded. It will be observed that it is not a case of the libelant neglecting to take measures to enforce his lien. He did within suitable time file his libel, and thereupon, in the due course of law, process would have issued for the seizure of both vessels. But thereupon the libelant failed to take measures for the usual legal procedure for seizing the tugs. Whereupon the Vosburgh came in voluntarily and bonded, and it was only through her vigorous intervention that the Whitbeck was afterwards seized.

In The Young America, 30 Fed. 791, 792, process was issued against the vessel, but the marshal let the vessel go out of his custody and about her regular business; and the court held that the liens accruing while the vessel was so out of the actual custody of the marshal were not cut off by the issue of process, but were subsisting liens on the vessel. The court says:

"The rule excluding subsequent liens cannot be extended to vessels that are not actually, as well as constructively, in the marshal's possession. Where a plaintiff, as in this case, obtains only a nominal arrest of the vessel, and virtually directs that she be left to pursue her ordinary business, with its attendant liabilities to other persons in contract or in tort, he must be held to have waived the benefit of the custody of the court as a protection against other liens, and to be estopped from claiming, as against third persons, the exemptions that belong only to a vessel in actual custody. Otherwise, not

only would third persons be misled and deceived, but ready means would be offered of running vessels without liability to any further liens at all. Such a practice would be a plain abuse of the process of the court."

How much the more should subsequent lienors be protected where the libelant has invoked the intervention of the court, and thereupon suspended its usual and suitable procedure! The learned judge in the case cited, further discussing the question of laches, said:

"As there is no fixed time to constitute laches applicable to all cases, it should be determined with reference to the equitable maxim, 'Sic utere tuo ut alienum non lædas,'—enforce your own rights so as not to injure others. It would be in the highest degree inequitable to permit lienors like Putnam or the insurers in this case, who have claims far in excess of the val e of the vessel, to lie still when there was daily opportunity to enforce their claims by legal proceedings, and to permit the vessel to obtain credit in daily business on her own security from innocent third persons, when the prior lienors knew, but the latter lienors did not know, that the vessel could never be made to respond for a dollar of the credits thus obtained. The rule of justice and equity in such a case clearly demands that a comparatively brief period of inactivity, where there was full opportunity for attaching the vessel, should be held to constitute laches sufficient to postpone the prior lien in favor of subsequent lienors, who were thus prejudiced by the delay and by the want of notice. * * * Of course, there was no intention of any abandonment of the libelant's lien, or of an entire release or discharge of the vessel from suit; but, as respects third persons who were ignorant of the facts, it was equally to their prejudice; and in all such cases I must hold the libelant's lien postponed to the later liens that accrue in consequence of such partial release, and without notice."

It is considered that the facts in the present case strongly demand the application of the principles and rules laid down in the opinion in The Young America, and that the lien for the collision damages as regards the Whitbeck should be postponed in favor of the three subsequent liens mentioned. The unfortunate result of this decision is that the injury does not fall upon the libelant, where in broad justice it belongs; but as the judgment directs that, in the case of any insufficiency on the part of either tug in the payment of the decree, recourse may be had to the other tug, and as the proceeds of the sale of the Whitbeck will be largely absorbed in the discharge of the liens, the decree for the collision damages must fall upon the Vosburgh. This is apparently inequitable, but the case falls so clearly within certain usual rules that an escape from the conclusion that the Vosburgh cannot be relieved is unavoidable. As the tugs were joint and several wrongdoers, the libelant was privileged to sue either or both, or to make each a formal party, and to seize either under the process of the court. Therefore his failure to seize the Whitbeck at all cannot be regarded as laches in favor of the Vosburgh, and consequently the staying of the process against the Whitbeck was the exercise of a right on the part of the libelant, so far as the Whitbeck is concerned, from which no conclusions unfavorable to the libelant can be drawn. A person exercising a right cannot be charged with wrong. Under the rules, the Vosburgh had a right to ask to have the Whitbeck brought in as a party, if she was not already a party; or, if she was a party, to ask that the delayed process against her should be issued, and that she be seized thereunder. This course the Vosburgh did finally take. It was the privilege of the libelant to leave the Whit-

beck out of the litigation altogether if he saw fit, and it was the privilege of the Vosburgh to bring the Whitbeck into the litigation. The subsequent liens largely accrued subsequently to the appearance of the Vosburgh, which was on April 3, 1893; and, if there was any delay thereafter in bringing in the Whitbeck, the fault to a considerable degree is ascribable to the Vosburgh, as she had the full right and power to compel the issuing of the process; but no application was made therefor until June 27, 1893. Under these circumstances, it is thought that no relief can be afforded to the Vosburgh, although there was laches on the part of the libelant, so far as the subsequent lienors of the Whitbeck are concerned. An order will be prepared in accordance with the views here expressed.

THE AGGI.

(District Court, E. D. New York. April 7, 1899.)

1. SHIPPING—SEAWORTHINESS—INSPECTION.

The inspection required as to the seaworthiness of a vessel is anticipatory, and not alone for the discovery and correction of defects from which harm has arisen; and a system which contemplates a general overhauling and inspection of the vessel only every four years, and between such times only a general examination by the officers at the end of a voyage to ascertain whether there has been leakage, is inadequate to meet the requirements of the law.

2. SAME—INJURY TO CARGO FROM LEAKAGE.

A steamship had a wooden figurehead under her bowsprit, which was supported by scroll work extending back for several feet on each side of the vessel, to which it was secured by bolts passing through the sides, and fastened by nuts on the inside. This scroll work was subject to the action of the seas in heavy weather, especially when the ship was heavily laden; and such action had a tendency, at least, to loosen gradually the nuts on the bolts, if it did not necessarily do so when continued for any considerable time, and in such event the water could enter around the loosened bolts into the fore peak. The ship started on a voyage of several thousand miles, which would occupy some two months, and during which would occur the autumnal equinox. She was so heavily laden as to bring the scroll work within about nine feet of the water line. The fastenings of the scroll work had not been inspected for two years, and the only inspection made previous to entering upon the voyage was to ascertain that there had not been previous leakage. A consignment of sugar was stowed in the fore peak, which was injured during the voyage by water entering around the loosened bolts securing the scroll work. The ship encountered severe weather during the voyage, but no more so than was reasonably expectable. Held, that the facts were insufficient to sustain the burden resting on the owners to show due diligence to render the ship seaworthy at the inception of the voyage, under the requirements of the Harter act.

3. SAME—PERILS OF NAVIGATION—EVIDENCE OF SEAWORTHINESS.

Storms encountered during a voyage, although they may have been an adequate cause for an injury to the vessel resulting in leakage and damage to the cargo, are not sufficient to relieve the carrier from liability for such damage, nor from the burden of proving seaworthiness, where they were not of such an unusual character but that they should have been anticipated, and it is not shown that the injury could not have been provided against by proper inspection and care with respect to the part injured before sailing, and such inspection was not made, nor care exercised.