## THE NISSEQOGUE.

(District Court, E. D. North Carolina.    March 24, 1922.)

Nos. 169–179.

1. **Salvage ⊚⇒27—Salvage award made for services to leaking schooner off Cape Fear bar.**

A salvage award of $2,000 made for the services of three tugs rendered to the schooner Nisseqogue, which was anchored off Cape Fear river bar, in a leaking and dangerous condition. One of the tugs went out to the bar in the usual course of business to get a tow, and brought the schooner in and beached her at Southport; this service requiring 2½ hours, with no particular danger to the tug. There the three tugs partially pumped the schooner out, and then towed her to Wilmington, where the pumping was continued, in all 39 hours. The schooner and cargo were appraised at about $71,000, and sold by the court for about $22,000.

2. **Seamen ⊚⇒27—Election to accept discharge terminates right to lien for wages.**

A schooner became disabled on a voyage, and while in a port awaiting repairs was libeled for salvage and other claims, and seized by the marshal. The owners notified the master that the voyage, and in effect that the vessel, would be abandoned, which notice was read to the crew. The master having no funds, the crew filed a libel for wages, alleging their discharge, but remained on board until the vessel was sold, performing such duties as were required. *Held*, that their filing of the libel was an election to accept the action of the owners as terminating the voyage, and that, as against other lien claimants, they were entitled to a lien for wages only to that time.

3. **Maritime liens ⊚⇒37—Furnisher of supplies to crew of vessel under nominal arrest only held entitled to lien.**

Where, in a suit in rem against a schooner then undergoing repairs at a way port in the course of a voyage, the marshal took only nominal possession, leaving the master and crew in charge, in the expectation that the owner would furnish bond and continue the voyage, until notified to the contrary, libelant, who furnished supplies for the crew in the meantime on orders of the master and without knowledge of the attachment, *held* entitled to a lien therefor with the same rank as to priority as that for wages of the crew.

4. **Maritime liens ⊚⇒37—Repairer held entitled to lien as against other lien claimants.**

At the time a vessel was seized under a libel she was undergoing repairs at a way port in the course of a voyage, made necessary by damage caused primarily by leakage through a split sea suction pipe. The repairs were contracted for by the master with approval of the owner, and were continued and completed after the seizure, which was only nominal, without objection by the marshal or libelant; the crew remaining on board and the intention being to resume the voyage when they were completed. Other libels were filed, however, and the vessel was sold. *Held*, that the repairer was entitled to a lien, and that, in the absence of any evidence to the contrary, it would be presumed that the repairs, which were necessary, enhanced the value of the vessel to the extent of their reasonable cost.

5. **Maritime liens ⊚⇒14—Libelant held entitled to lien for advances.**

Libelant, who on request of the master and on the credit of the vessel made advances to pay the necessary expenses to enable a vessel, which had secured a cargo in a foreign port, to clear and proceed on his voyage, *held* entitled to a lien therefor, and acceptance of a draft drawn by the master on the owners for the amount, which was dishonored, *held* not a payment, in the absence of evidence that it accepted as such.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Maritime liens ⊚⟹37—Marshaling of liens; voyages of tramp vessel.**

Where a vessel, after leaving her home port with a cargo, before returning, carried other cargoes between different ports, as between claimants who made advances to her in different ports, for the carriage of different cargoes, her voyage must be held a continuing one, until her return to her home port, and their liens stand on an equality.

In Admiralty. Suit by Phillip Shore and others against the schooner Nisseqogue. Decree determining liens and their priority.

Robert Ruark, of Wilmington, N. C., for Phillip Shore.

Robert W. Davis, of Southport, N. C., for R. R. Stone.

E. K. Bryan, of Wilmington, N. C., for Wilmington Iron Works.

John D. Bellamy & Son, of Wilmington, N. C., for seamen.

Rountree & Carr, of Wilmington, N. C., for Furness Shipping Co. and Diamond Steamboat Wrecking Co.

George L. Peschau, of Wilmington, N. C., for C. E. Collins.

Thomas W. Davis, of Wilmington, N. C., and John T. Tucker, of Baltimore, Md., for Davison Chemical Co.

John D. Bellamy & Son, of Wilmington, N. C., for Bar Pilot Ass'n.

CONNOR, District Judge. The Nisseqogue is an American four-masted schooner of 194 feet length, 39 feet beam, 14 feet depth, carrying a crew of 14 men, built in Brunswick, Ga., in 1917, 971 tons gross, 859 tons net, owned by Smith Navigation Corporation, with her home port at New York. At the time and upon the voyages hereinafter set forth, her master was Sven G. Berglund. While she was at the port of Rotterdam, November 27, 1919, the Furness Shipping & Agency Company, of that city engaged in the business of shipping brokers, at the request of her master, between November 27, 1919, and January 2, 1920, furnished and delivered supplies, services, and disbursements to the said schooner to the amount of 14,451.11 guilders, as nearly as can be ascertained, amounting to $5,420.29 in American money, as shown by the statement approved by the master and attached to the libel filed herein.

The schooner sailed from Rotterdam, January 12, 1920, for Oporto, where she was to deliver a part of her cargo, and the balance at Cadiz. From Cadiz she sailed, light, to Norfolk, Va., reaching there the first part of June, 1920. She sailed from Norfolk, Va., to St. John, New Brunswick, light; thence to Queenstown, where, under orders, she sailed to Runcorn, England, with a cargo which she discharged, and sailed, light, to Tampa, Fla., where she arrived on October 28, 1920, at which place she took a cargo of lumber for Cienfugos, Cuba. Upon her arrival at Tampa, libelant Phillip Shore was employed to act as the agent of the schooner, and alleges that, at the request of the master, he advanced to the said master, upon the credit of the schooner, for the purpose of furnishing him funds wherewith to pay the wages of the crew of said schooner, on October 29, 1920, the sum of $5,000. Thereafter, and while said schooner remained at Tampa, on November 23, 1920, at the request of the said master and owner and from time to time during said period, said Phillip Shore alleges that he advanced

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and furnished to the said schooner and her master and owners, for the purpose of enabling master and schooner to obtain necessary work, supplies, and funds wherewith to discharge valid obligations incurred by said schooner, the sum of $5,974.36, which sums were necessary on behalf of said schooner, as shown by statement which has been approved by the master and furnished to the owners.

While at Tampa, November 28, 1912, George F. Bowen and the other seamen, libelants herein, shipped, under shipping articles, form B, as prescribed by the Department of Commerce Bureau of Navigation, Shipping Service, on the said schooner. The shipping articles signed by the seamen described the voyage as:

"From the port of Tampa, Florida, to Cienfugos, Cuba, and such other ports and places, in any part of the world, as the master may direct, and back to a final port of discharge in the United States, for a term not exceeding six calendar months."

After her arrival and discharge of cargo at Cienfugos, the schooner, under the same master and crew, took on a cargo of 1,000 tons of pyrites ore, and on January 26, 1921, sailed for Baltimore. On February 9, 1921, while on her course to Baltimore, and "about half way between Cape Lookout and Cape Hatteras, in the Gulf Stream, with squally weather and strong winds and rough seas," it was discovered that she was leaking, having made 19 inches of water from noon on that day to 4 o'clock, in four hours' time. On account of the condition of the weather and of the schooner, the master, on the evening of February 10, 1921, brought her under her own sails off the Cape Fear bar, and anchored four miles from the bar; the master thinking that he was "up to the bar." When the fog lifted, he moved her, under her own sails, within a mile of the bar. At that time it was raining, and the wind was from the south, blowing strong.

During the night the wind changed to the westward, "with a strong breeze, and the sea increased from the south, so that the vessel was rolling in the trough of the sea." At 7 o'clock a. m., February 11th, a pilot was received. Preparations were commenced to get under way for crossing the bar in to Southport, with 30-fathom shackle outside hawsepipe, the foresail was hoisted and other preparations made, when the porthole and "wild-cat" broke, and the chain to starboard anchor commenced running out. The port anchor was then let go and the sails taken in. The tugboat Blanche, standing near, took the schooner in tow about 10:30 a. m., and at 1 p. m. the schooner was grounded in Southport harbor. The Blanche and Alexander Stewart worked to siphon water out of her hold, and by 7:45 a. m., February 12th, had lowered the water from 72 inches to 54 inches, when she started to Wilmington, with master, crew, and pilot aboard, in tow of the tug Alexander Stewart, and docked at noon of same day at the Wilmington Iron Works for repairs. The two tugs remained by her, pumping water, until noon, February 13, 1921.

On reaching Southport the master, without delay, communicated to the owners of the schooner "her apparent condition and asking instructions." He was advised by the owners "to use his judgment"; that a representative of the company, owners, would come to Wilming-

ton. The master instructed the seamen to remain with the vessel, which they did. On February 13, W. G. Renaut, port captain of the Smith Navigation Company, owners of the schooner, arrived at Wilmington, and immediately, in the interest of the owners, took charge of all repair work to be done on the schooner. On February 14th Renaut called for a survey, in order to determine her condition, which was made by H. E. Queenstedt, surveyor of the American Bureau of Shipping. The survey showed that the—

"three-inch pipe of sea suction, in board of sea valve, was split for about 3 feet and opened up 2 inches. Riding chock for starboard anchor chain carried away and broken. Jib boom cracked for about 4 feet from bowsprit cap. Both anchors. and 180 fathoms of chain, lost off Southport bar, and 180 fathoms of 5-inch mooring lines and 90 fathoms of 6-inch mooring lines damaged by water and badly chafed from having been washed about; the same having been stowed in hold."

The survey recommended that certain repairs be made to the schooner, in consequence of which the master contracted for making such repairs with the Wilmington Iron Works. It was the intent and purpose of the master, upon the completion of the repairs, to proceed on his voyage to Baltimore. The officers and crew were kept on board and assigned to their duties. From February 11, 1921, to the day on which the schooner was towed to Wilmington, February 14, 1921, she was treated by her master and owners as a vessel, temporarily unseaworthy, needing and awaiting the completion of repairs to complete a voyage, with a crew held intact until such repairs were made. The Wilmington Iron Works began repairing the schooner on the 12th day of February, 1921, and while so engaged libelant Phillip Shore, on February 21st, filed the libel herein, and the marshal, on the same day, served the libel and monition by taking said schooner into his custody. No caretaker was put on her.

On March 3d, libelant R. R. Stone, owner of the tugs Blanche and Alexander Stewart, filed the libel herein, claiming $5,000 for salvage. The monition and attachment was levied the same day. Other libels were filed as of the dates appearing in the record. The master had no instructions from the owners until March 14, 1921, when he received, and immediately read to the officers and crew, the following letter:

"Wilmington, N. C., March 14, 1921.

"To the Master, Officers and Crew, American Schooner Nisseqogue, Wilmington, N. C.—Gentlemen: You are hereby notified to file your claim against the schooner Nisseqogue, for the reason that, on account of libels involved, the Smith Navigation Corporation, owners of the vessel, have decided to leave the vessel here and let matters take their course.

"Yours truly,           W. G. Renaut, Port Captain,
    "Smith Navigation Corporation, 17 Battery Place, New York, N. Y."

The owners, after this letter, have taken no further action in respect to the vessel or her cargo. At this time, and at no time thereafter, did the master have any funds with which to pay the crew the wages due them. He received no further instructions from the owners. The marshal retained the custody of the schooner until May 21, 1921, when appraisers appointed by the court appraised the schooner at $62,-239; anchor and chains at $2,494; cargo at $6,000. On May 10, 1921,

a decree was entered, ordering the marshal to sell the schooner, her tackle, apparel, furniture, freight, cargo, and anchor and chains; that the cargo, anchor and chains be sold separately. Pursuant to said decree the marshal, after advertising same as directed by the decree, sold the schooner for $19,550, anchor and chains for $600, and the cargo for $1,275. On June 11, 1921, after notice to all parties interested, no objection being made, an order was entered confirming the sale.

The order was made on May 4th, appointing a special master to hear evidence and report his findings of fact upon the claim of the seamen and such other libels as counsel should desire. Upon filing the report, the libels were consolidated and heard upon the evidence taken by the special master, stipulations of counsel, and further oral evidence. By reason of the deficiency in the amount for which the schooner was sold, the several libelants litigate each claim, rendering it necessary to examine and pass upon the amounts, validity of the lien, and order of priority of each of the claims. The order, in respect to date of filing the libels, will be disregarded, and the libels disposed of in the order of their priority. The salvage claim will therefore be first considered.

### R. E. Stone—Salvage.

[1] On February 9, 1920, it appears from the ship's log book that she was—

"beating around Frying Pan Shoals, one mile distant; a heavy fog set in at 6.30 p. m., which lasted until 10:40 a. m. She was leaking; had pump going; at noon had 44 inches water, gain of 6 inches since morning. February 11th, foggy, cloudy weather, fresh breeze, W. S. W. on course for Cape Fear river bar; at 3 p. m. came to anchor in 7 fathoms water, supposedly off bar. At 6:30 p. m. fog cleared, when found vessel was anchored 4 miles from bar; hove up anchor and run to bar, and anchored with entrance buoy. At 2 a. m. paid the 60-fathom shackle. At 7 a. m. received pilot; commenced getting under way when 30-fathom shackle outside hawsepipe, hoisted foresail, and, when short, hoisted staysail and jib, and, while breaking anchor, pawl wheel and wild-cat broke and chain commenced running out; let go the port anchor and took in the sails; water in vessel gathering fast, heaving s'ly sea. Strong westerly wind; were obliged to cut the starboard chain in order to slip both anchors to save vessel; slipped about 10:30 a. m., and took tug Blanche and proceeded in Cape Fear river. Hoisted staysail, jib, and foresail to help tow boat against strong ebb tide. At noon off the fort. Weather clear; wind west, blowing strong. At 1 p. m. vessel grounded off Southport, when tug and pilot left. At 1:30 p. m. vessel boarded by board of health. At 2 p. m. vessel apparently sunk, listing over to starboard, with the outside water reaching up to the hatch coamings on starboard side."

Capt. Newton, the pilot who went to the schooner, says:

That he was on her about two hours before the Blanche came. Master said, "She is sinking;" told him to "go forward and slip his chain." Said he could not get to the chains—too much water; called for hack, saw and sawed them in two, tug there at that time; wind blowing strong southwest; shifted to west; "big sea washing across, coming in over side and going over other; told captain of the Blanche that she was sinking, not to leave, "we may have to leave in the boat." Requested prompt action. As soon as the chains were cut, captain of Blanche got the foresail and jib on her and got the hawser; would have been hard to get the hawser on her. She was rolling and jumping so, "it would be dangerous if you got under the vessel." The vessel could not have been sailed into the harbor at that time without the tug; do not know when it would have gone ashore; water about seven fathoms. She

would have gone on the breakers without the tug; there was no anchor; she would not steer. The bottom would have been knocked out, loaded with iron ore. It was between three and four hours before the Blanche ran her ashore with 5 or 6 feet water in her. "I went home;" took the Blanche about half an hour, a little over, to go from Southport to the vessel; laid by her before we got ready for her "to take hold." The Blanche is 94 tons net. Witness has been a pilot 30 years; had no mishap. "I did not solicit the Blanche to come to the vessel. She came unsolicited; always does so when "sees anything; looking for anything that comes along." Nisseqogue was not flying any distress signal. When the Blanche came along, the master of vessel "wanted her and wanted her bad." When the tug came up, I told her captain "to get the hawser as soon as he could;" was acting for the master of the vessel.

Capt. St. George and Capt. Sellers, on the Blanche, when she went to vessel, corroborated Capt. Newton:

Says that he thinks the tug in grave danger. There was no other tug available. After the Nisseqogue was beached, at about 1 o'clock, the Blanche returned to Southport, and her captain phoned Mr. Stone at Wilmington to send the Alexander Stewart to help pump her out. Went to the vessel and put the pumps to work; got the water low enough to make it safe to tow her to Wilmington. Seven men on the Blanche, four on the Stewart, and two on the Isabelle. They stayed by her and towed her to Wilmington. Worked all night, from Friday afternoon until Sunday noon, pumping, 39 hours. Used a four-inch pipe pumping a siphon. Stewart about 50 or 60 tons. The usual charge for towing from the bar to Wilmington, and back, is 50 cents a ton, "round tonnage." The Blanche built some 40 years ago. "The sea was not, at the time we went out, such as to deter us from going out to get a regular tow. If the vessel had not been in distress, we would have gone after her just the same."

This constitutes the substance of the evidence respecting the service rendered by the Blanche, the Alexander Stewart, and the Isabelle; the two last named only assisting in pumping and towing the vessel to Wilmington.

It is not necessary to cite authorities in support of the claim of libelant for a salvage service rendered by the Blanche from the time she went to the Nisseqogue on the morning of February 12th, until she was brought into the harbor and grounded at about 1 o'clock; the period during which she was in actual service being from 10:30 a. m. until 1 p. m. The schooner was leaking, her pipes split, and she was in peril. The service rendered by the tug was voluntary, prompt, and successful.

The sole question for determination is as to the amount which should be awarded the Blanche in rendering the service from the time of reaching the vessel until she was grounded. She was towed up the river for a distance of approximately 30 miles. The value of the vessel and cargo, as disclosed by the sale, was very much less than was, at the time the service was rendered, supposed to be by all parties. There is no suggestion that any injury was sustained by the Blanche or her crew. This, however, does not eliminate from consideration the danger to which they were subjected. This should be kept in view, taking into consideration such damage as might naturally and reasonably be deemed incident to the peculiar service, in view of the weather and other circumstances. The evidence shows that the officers and crew on the Blanche were skillful and experienced seamen, especially

on that coast and bar. Their work was well and successfully done. The fact that, as shown by long and often disastrous experience, the place at which the vessel was found is one of peril to navigation along our coast, must also be considered. It is to be noted that the Blanche was engaged in the business of towing vessels to and from Wilmington and across the bar. She was, as said by her captain, ready "to go to anything"; that is, any vessel requiring her service as a tow or salvage. He further says that he would have—

"gone out to her under existing conditions for a towage service. If the vessel had not been in distress, we would have gone after her 'just the same.'"

While this does not affect the merit of the service, it takes the tug out of the class of cases in which merchant. or passenger ships either go out of their regular course or risk their ship with freight or passengers in a voluntary service to a vessel in distress. While the general principles by which courts are guided in making awards for salvage service are well settled, the amount awarded in each case of necessity differs, because of the varying and variant conditions existing in instant cases.

To some extent the facts in The Penobscot (C. C. A. 4th Cir.) 106 Fed. 419, 45 C. C. A. 372, are analogous to those found in this evidence. The schooner was grounded on the shoals very nearly at the same place at which the Nisseqogue was found by the Blanche. The Wilmington, a freight and passenger boat, was at Ft. Caswell, within two miles of Southport. Observing the condition of the Penobscot, she went to her assistance at 8 o'clock a. m., passing through the breakers; the waves going over her sides and into her engine room. She pulled the Penobscot off the shoals and towed her into port, being engaged in the service about an hour. She was valued, with her cargo, at $8,000. The District Judge awarded for salvage service $2,000. Upon appeal, Judge Goff said:

"We are of opinion that the services rendered by the Wilmington were meritorious, and that a fair and just compensation should be allowed for the same. The Wilmington promptly responded to the signal of distress, and willingly rendered the necessary assistance to the disabled schooner, and her conduct, under the circumstances, was most commendable. The steamboat was quickly moved to the sand shoals near the mouth of the Cape Fear river, where the schooner was aground, and during the time she was engaged in the salving work she was properly and skillfully handled. But we do not find that there was any great risk to the property used by the salvors, nor to the lives of those engaged in the work. The schooner was, doubtless, in great danger at the time the Wilmington reached her, and the cargo would probably have been lost, or greatly damaged, but for the timely assistance rendered by the latter."

The Circuit Court reduced the award to $1,000.

In The Launberga (D. C.) 154 Fed. 959, Judge Purnell discussed conditions somewhat analogous to those found here. The vessel was grounded on Frying Pan Shoals, apparently flying a flag of distress. The steamer Wharton, of the value of $40,000, with a crew of 24 men, engaged in fishing, went to her relief. Reference to the facts, as stated by the District Judge, will disclose conditions upon which the award was made. The salvage service extended over a period of 12 hours.

The vessel was in peril. She was brought into the harbor and anchored near Southport. She was pumped out by the Wharton, from September 22d to October 3d. The Wharton furnished coal and water for the boiler and a man to run the engine. The judge, after a very careful statement of the conditions, said:

"The services rendered the Launberga by the Wharton and crew were salvage services, but of a low grade, involving some risk to the steamer of the libelant, but little more than she had taken before in the pursuit of her business of fishing, no particular peril of life or limb, no unusual expense, and no gallantry, courage, or heroism; and the lives of the officers and crew of the Launberga were in no immediate danger or peril. The time employed in said salvage service was about 12 hours."

The value of the Launberga and her cargo was $14,100. The judge awarded $2,000.

In view of the entire evidence, conditions under which the service was rendered, its character, result, value of the Nisseqogue and her cargo, and of the Blanche, I am of the opinion that an award of $2,000 for the salvage, pumping, and towage by all of the boats belonging to R. R. Stone, libelant, is fair and just, being the first lien on the proceeds of the Nisseqogue and her cargo, to be apportioned as hereinafter directed.

### George F. Bowen and Others—Seamen.

[2] The only question presented in respect to the compensation due the seamen relates to the time at which, under terms of the shipping articles signed by them at Tampa and the law, their term of service, for which they have a maritime lien, came to an end. In addition to the facts found by the special master, hereinbefore stated, he finds that, prior to March 14, 1922, the master had no instructions from the owners in respect to the future movement of the schooner on her voyage to Baltimore, and he had no funds with which to pay them, and that after the libels of Phillip Shore and R. R. Stone, and the seizure of the schooner by the marshal, he was apprehensive that, if he gave the crew a discharge, they might in the absence of funds with which to pay them, be entitled to double pay. R. S. § 4529 (9 Fed. Stat. Anno. [2d Ed.] p. 156 [Comp. St. § 8320]).

The master further finds, and in this I concur, at the time the master received and gave notice to the crew of the instruction from the owners, March 14, 1921, he was without funds to pay his officers and crew, either the amounts then due for wages or a sum equal to one-third of the balance then due them, and that it does not appear that he could, either then or since, have raised sufficient funds for such purpose; that his failure to pay them was neither willful nor without sufficient cause or excuse; that the officers and crew had notice on March 14th that the master claimed to have no funds with which to pay them at the time; that, with such notice and information before them, the officers and crew of the schooner, on March 16, 1921, elected to consider their engagement at an end by libeling for their wages, but thereafter remained on board.

The record discloses that on March 16, 1921, G. F. Bowen and others, seamen, made an affidavit before A. S. Williams, United States

commissioner, at Wilmington, N. C., to obtain summons for seamen's wages, as provided by R. S. § 4546 (Comp. St. § 8335). Pursuant to the provisions of section 4547 (Comp. St. § 8336) the commissioner issued summons to S. G. Berglund, master of the schooner, returnable before himself on the same day, and said summons was served on the said master by the marshal. The amounts claimed by each of the seamen exceeded the sum of $100. In said affidavit the seamen described themselves as:

"Late mariners on board the Nisseqogue, setting out the amounts due them as wages, * * * which the master refused to pay."

On March 26, 1921, the seamen filed a libel before the United States commissioner against the schooner, containing a schedule of wages due each of them, aggregating $2,962.80. In the libel, after setting forth their employment and rate of wages, they allege:

"That during the whole time that they were in the service of the said S. G. Berglund, to wit, from the time when they went on board thereof to the time of leaving the same, they well and truly performed their duty as mariners on board said vessel, according to the best of their ability, and were obedient to the lawful commands of the said master and the other officers of said vessel. Your libelants further show that, at the time they were discharged from the said vessel, the wages earned by them as aforesaid were not paid to them, or any part thereof, except what was duly credited in the schedule annexed."

The libel was duly certified by the commissioner to the clerk of the District Court at Wilmington on March 26, 1921, and on same day monition issued and served by the marshal, by leaving a copy with the master "and retaining said vessel in custody."

On April 2, 1921, the same seamen filed in the office of the clerk an additional libel against the schooner, in which they set forth the foregoing proceedings and further allege:

"Third—That these libelants allege that the said vessel is liable to them for wages from March 6, 1921, to the actual discharge of these libelants, at the same rate of wages set forth in said libels; that in the said libels there was an allegation that these libelants were discharged, and these libelants aver that they thought they were discharged, but that some days after the libel had been filed the master of the said vessel insisted that they were not discharged, and stated that if they left the vessel they would be arrested for desertion, and in terror of such an arrest they remained aboard the said vessel, and the said vessel is now liable to them for their transportation to Baltimore, the port of discharge, set forth in their shipping articles."

No action was taken, other than filing this additional libel. Subsequent to the filing of the original libel by the seamen, March 16, 1921, several other libels were filed, based upon claims for repairs, advancements to the schooner, salvage of anchor and chain, supplies, and pilotage. The special master finds that:

"Subsequent to March 16th said officers and crew have been fed aboard, while the vessel was at her dock in Wilmington, N. C., performed duties aboard, pumping the vessel out, looking after lines, and other similar duties, remaining so aboard continuously till the day of the sale of the vessel on May 23, 1921, and are now claiming and have filed a second libel covering the period from March 16th."

The special master concludes that:

"The libeling seamen are entitled to wages (so far as to participation in funds from sale of vessel) to either March 14, 1921, the day notice was received that the owners would leave the vessel in Wilmington and let matters take their course, or March 16, 1921, the day the seamen libeled, and in view of all the circumstances"

—he recommends that they be allowed wages to and including March 16, 1921. To this conclusion the seamen libelants excepted. The question for discussion therefore is: To what date are the seamen entitled to a maritime lien on the schooner for wages. It will be well to dispose of several contentions made by the seamen and other libelants in regard to which there is no substantial difficulty.

It is suggested that the rights of the seamen, in respect to the date of their discharge, are governed by the provisions of section 4526, R. S. (Fed. Stat. Anno. p. 152 [Comp. St. § 8317]) ; that if the term of service terminates before the period contemplated in the agreement, by reason of the loss or wreck of the vessel, such seamen shall be entitled to wages for the time of service prior to such termination, but not for any further period. Provision is made for them as destitute seamen. It is manifest that the Nisseqogue was neither "a loss nor wreck" at the time she was brought into the port of Wilmington.

It is, on the contrary, contended by counsel for the seamen that by the terms of the shipping articles the term of employment was for six months from their date. The language of the articles excludes this construction. The term of service beginning November 18, 1920, was primarily for a voyage from Tampa to Cienfugos, and such other ports and places in any part of the world as the master may direct. This was met by taking the cargo of pyrites for Baltimore, Md., which entitled the seamen to wages to that port, "and back to a port of final discharge in the United States, the entire term for which they were within the foregoing limitation to service and the master to employ for a term of time not exceeding six calendar months." It would seem clear that the term of service, after entering upon the voyage from Cienfugos, could be terminated by either party upon reaching Baltimore, with the right on the part of the seamen to be carried to a port of final discharge in the United States. It is not necessary to discuss the question as to the right of the seamen under this clause.

Assuming, therefore, that the master was not entitled, under the terms of the contract, to discharge the seamen at Wilmington, the question arises: Were they discharged, and, if so, on what day? The owners elected on March 14, 1921, for the reasons stated in the letter to the master, to abandon the completion of the voyage and "to leave the vessel at Wilmington, where she was then 'docked,' undergoing repairs, and let the matters take their course."

The question presented by this condition of the vessel and action of the owners is not, for the purpose of this discussion, whether the seamen were "discharged," in the sense of having their contractual relation to the owners severed, and their right to sue them in personam for wages or damages for breach of contract, but whether their right to a maritime lien on the schooner, as against other libelants, terminated

when acting upon the notice given them by the owners. They filed their affidavits March 16th before the United States commissioner, followed by the libel March 26, 1921, pursuant to sections 4546 and 4547, R. S. In these affidavits, and schedules filed therewith, they describe themselves as "late mariners on the Nisseqogue" and allege the amount of wages due them "at the time they were discharged."

The libel and monition, based upon said affidavits, were served on the master and the marshal "returned" that he "had retained the custody of the vessel"; it being then in his custody, upon other libels filed and served prior to said date. It was open to the seamen to elect to accept the statement of the owners that the voyage, for the reasons stated and well known to them, had been abandoned. The master had no funds with which to pay the wages due the seamen.

The vessel had, at that time, been libeled for claims amounting to $15,000. The owners were unable to file a bond for her release, and, as shown by subsequent events, wisely declined to do so. It would seem that the course open to the seamen was that provided by R. S. § 4529 (Federal Statutes Anno. [2d Ed.] p. 156). If the right to terminate the employment and discharge the seamen was fixed by the terms of the shipping articles, by the conclusion of the voyage at Baltimore, they may, provided the master refuses or neglects to make payment in the manner provided without sufficient cause, demand a sum equal to two days' pay each and every day during which payment is delayed beyond the period of such wrongful discharge. This, however, they did not do, but elected to treat the action taken by the owners as a discharge, and libeled for the wages due.

It is insisted by other libelants that the seizure by the marshal upon the first libel terminated the voyage and the seamen's rights to a lien for wages. This view was taken by Judge Dodge in The Philomena (D. C.) 200 Fed. 873 and The Bethulia (D. C.) 200 Fed. 876. In The Esteban de Antunano (C. C.) 31 Fed. 920, 924, Pardee, Judge, said:

"When * * * the steamship * * * went into the custody of the law, and her contemplated voyage was broken up and abandoned, and thereby the authority of her owners and of their agents, the master and ship's husband, to thereafter affect the ship by any conduct or contract to result in a lien on the ship, was ended. By the seizure all persons were notified of the change of control and possession. While the ship was in the custody of the law, it is doubtful whether, on any account or for any service (except, perhaps, for salvage, or through a collision), any lien could arise on the ship; certainly not without the express authority of the court having the property in possession."

The marshal is responsible for the care of the ship, and any person entitled to be allowed any expense incurred in discharging such expense is taxable as a part of the cost, and not by the assertion of a maritime lien enforced by a libel. The Augustine Kobbe (D. C.) 37 Fed. 702. Whatever the rule usually applied may be, it seems clear that, if the seamen elect to recognize and accept the action of the owner as the abandonment of the voyage, and notice to the seamen that the vessel had been libeled and would not be replevied—that matters should take their course, all of which was true and well known to the

seamen—they are bound by such election, and could not continue to remain on board and claim a lien for wages until they saw fit to abandon the vessel.

If this be the correct view, no act of the master, the vessel being in the custody of the marshal, could as against other libelants re-establish or continue the relations of seamen, with the right to fix a lien upon the vessel. After the marshal had taken the schooner into his custody on the 21st day of February, 1921, he was alone responsible for taking care of her. The master could not, by any contract or otherwise, confer upon the seamen a right to remain on the vessel and impose upon her a maritime lien for wages not earned at the date upon which she passed into the custody of the marshal. It would seem but just to the seamen, who, in good faith and without objection on the part of the marshal, until the owners determined to abandon the voyage and the schooner, remained on the vessel discharging their duty, until notified by the owners they should receive their wages for a reasonable time. This time they fixed on March 16, 1921.

I concur with the special master that they are entitled to a lien for wages up to, and including, that day.

### Collins Libel.

[3] When the schooner was placed at the dock or wharf of the Wilmington Iron Works on February 12th, and the survey made on February 14th, the representative of the owners contracted with the Iron Works to make the repairs as recommended. The crew remained on board, discharging such duties as directed by the master. The marshal, on February 21st, served the Phillips Shore libel for approximately $10,000. It does not appear that he took the schooner into his actual custody, by placing a caretaker on her, or posting notice of attachment upon her masts or other places, nor was any publication of the process made. The appraisal of the schooner, later on, placed her value at $62,239 and her cargo at $6,500. The schooner was in good order and condition, except for the injury to her pipes, involving, as developed, an expenditure of about $2,800 for repairs. It is quite evident that the libelants did not desire or direct, nor did the marshal do more than execute the libel, leaving the vessel at the wharf in the city undergoing repairs, as doubtless all concerned expected that her owners would arrange a bond and proceed on her voyage to Baltimore. On March 3d, the owners of the tug filed a libel for salvage, claiming $5,000. No change was made in the condition until March 14th, when the notice was given that the owners would abandon the voyage. During the period intervening between February 12th and March 16th, no other libels were filed. The report of cost and expense returned by the marshal shows no claim for a caretaker. During this time, at the request of the master, Collins furnished provisions to the crew amounting to $401.07, an itemized statement of which is filed with his libel, approved by the master. Of this amount $97.88 was furnished prior to, and including, February 21, 1921. His libel was filed May 16, 1921, and served the same day.

In their briefs filed, none of the libelants make objection to this claim, other than the Furness Shipping Company, whose libel was filed March 30th. While it is true, as contended and the authorities cited show, after the schooner is taken into custody by the marshal, no new contract can be made or liability incurred, fixing a lien upon her, the facts discussed here bring the case, so far as Collins' claim is concerned, within the rule laid down by Judge Brown in The Young America (D. C. S. D. N. Y.) 30 Fed. 789. There a libel was filed and process issued to the marshal, who made a formal arrest. The libelant's proctor, however, looking for a settlement of the case, and the owner not being able to give bail for the tug's release, the marshal was directed by the libelant not to tie her up, nor to put a keeper on board, and she was permitted to run about the harbor in her usual business as before. While this condition existed, coal was furnished her, for which libels were filed. Upon a sale, there was a deficiency. The question was whether the libelants furnishing coal, after the vessel was arrested, were entitled to a lien. The learned judge, after stating the general rule, says:

"So far as respects the parties to the cause, the benefits of the rule may be waived, and the rule cannot properly be applied at all where, by direction of the parties, the arrest of the vessel is formal only, and is not designed to be followed by any actual possession of the marshal."

While stating strongly the objections to the course pursued, he says:

"The rule excluding subsequent liens cannot be extended to vessels that are not actually, as well as constructively, in the marshal's possession. Where a plaintiff, as in this case, obtains only a nominal arrest of a vessel, and virtually directs that she be left to pursue her ordinary business, with its attendant liabilities to other persons, in contract or in tort, he must be held to have waived the benefit of the custody of the court as a protection against other liens, and to be estopped from claiming, as against third persons, the exemptions that belong only to a vessel in actual custody. Otherwise, not only would third persons be misled and deceived, but ready means would be offered of running vessels without * * * any further liens at all. * * * For these reasons I must hold the claims of the materialmen to be liens on the tug."

While the facts are not identical in the two cases, I think that those disclosed in this case bring the claim of Collins within the reason of the exception to the rule and the equity clearly stated by Judge Brown. The evidence in this case, as disclosed by the general course pursued, clearly shows that, until March 14th, the libelants who had filed libels expected the owners to bail the vessel and continue the voyage. As matters then stood, or appeared, it was a reasonable expectation. The vessel was of amply sufficient value to pay the claims then known and filed. She was undergoing repairs under the direction of the representative of her owners. The terminal of her voyage was Baltimore, and no suggestion had been made of her abandonment. The crew had not been discharged, and, so far as appears, no suggestion had been made that they would be. The proper care of the schooner required their presence on board. There is no suggestion that the libelant who furnished food to the crew had any notice or information that the libels had been filed or that the marshal served them. If the crew

had not remained on board, and given proper care and protection to her, the marshal would have been compelled to provide other means for doing so. These conditions ceased on March 16th, when the seamen filed libels for their wages, and every one had notice of the libels and the abandonment of the vessel by her owners.

To reject the claim of the libelant who furnished food for the crew to that date would be inequitable and unjust. The claim to the amount of $401.07 is allowed, as of the same priority as the seamen.

### Diamond Wrecking Steamboat Company—Salvage Anchor and Chain.

The Nisseqogue, as testified by her master and the pilot, at the time she was taken by the Blanche, slipped her anchors and chains, to save the vessel. After the schooner was brought to Wilmington, Heide & Co., as her agents, and W. G. Renaut, port captain, for the owners, entered into a contract with James S. Williams, manager of the Diamond Wrecking Steamboat Company, by the terms of which the said Wrecking Company undertook to salve the anchors and chains, in consideration whereof it was to be paid $750 for each anchor and its chain delivered to the owners, and, if not recovered, it was to receive no compensation for its efforts. The Wrecking Company "rigged out" the steam barge Beaver, of 250 tons, and its tugboat Resolute, for the purpose of recovering the anchors and chains, at great trouble and expense, and with a crew of firemen and eight men on the Beaver proceeded to the place at which the anchors and chains were slipped with the Resolute; and after much effort succeeded in raising one anchor and 75 fathoms of the chain. The other anchor was in the rocks at the bottom. It was impossible to recover it.

The representative of the Nisseqogue and the manager of the Wreckage Company agreed upon the sum of $1,050 for salving the anchor and chain. The representative of the schooner estimated the anchor and chain to be worth to her $3,500. The money was not paid to the Wrecking Company. The libel was filed and served April 11, 1921. The anchor and chain were sold by the marshal for $600 and sale duly confirmed. None of the libelants litigate the claim of the Wrecking Company.

Decree awarding to the Diamond Wrecking Company the sum of $1,-050, and the payment to it of the proceeds of the sale, less its proportionate part of the cost and 1 per cent. marshal's commissions.

### Intervention of the Davison Chemical Company.

The Davison Chemical Company, on August 17, 1921, filed a petition averring that it was the sole owner of the cargo, 1,000 tons of pyrites, on the schooner, and prayed that it be permitted to intervene in the proceeding and assert its title and claim to the proceeds, subject to such claims as the court should find to be a lien thereon. The petition was allowed, and the court finds that the cargo was the property of petitioner. It was sold for $1,275, which sum will be treated for this purpose as its true value.

The sole question presented by the Chemical Company is the liability of the cargo for other liens than the salvage and its proportionate

part of the cost. The decree will direct the payment to the Davison Chemical Company of the proceeds of the cargo, less the marshal's commissions of 1 per cent. and its proportionate part of the costs.

### The Wilmington Iron Works—Repairs and Wharfage.

[4] The master finds, and I concur therein, as hereinbefore set· forth, that the schooner was, upon reaching Wilmington, February 12th, carried to the wharf of the Iron Works for repairs; that, on the 13th, W. C. Renaut, the port captain of the owners, took charge of "all repair work to be done on her." On February 14th he requested a survey to be made in order to determine her condition, which was made by H. E. Queenstedt, surveyor ·of the American Bureau of Shipping. The survey showed certain injuries sustained by the schooner and recommended certain repairs to be made, all of which are fully described in his report. In consequence of such survey and the recommendation of surveyor, the work on repairs was begun. It was the purpose and intention of the master of the schooner to proceed on his voyage to Baltimore when the repairs were completed. While the repair work was in progress, February 21, 1921, Phillip Shore filed a libel upon the schooner, .which was executed on the same day. On March 3d R. R. Stone filed a libel, and on March 18th the Wilmington Iron Works filed a libel for repairs.

The repairs made by the Iron Works began on February 12 and were finished March 7, 1921, when a statement was rendered to the master, and approved by him, amounting to $2,854.34, all of which work was done and material furnished under the direction and supervision of the master and with the consent of the owners. The repairs were necessary to put the schooner in safe condition and continue her voyage. The charges for work and ,material made by the Iron Works, approved by the master, are reasonable. They necessarily enhanced her value. It is impossible to ascertain or find what she would have brought at public auction, if left in the condition in which she was brought to Wilmington. There was but small demand, at that time, for vessels, and although the sale was advertised in the New York Herald and other newspapers, and on the part of the libelants considerable effort was made to interest purchasers, there were but few bidders. Efforts were made, after the biddings were closed, to secure advanced bids, without success. No evidence was offered tending to show to what amount the repairs enhanced her value or increased the price for which she was sold, other than the amount charged and the approval of her master. The special master finds, and in this I concur, that—

"Such errors, if any, the master may have made, were mere errors of judgment. His fidelity to and faith in his owners were refreshing."

It is insisted by other libelants that—

"the repairs to ship constitute a maritime lien on her only for such work done and material furnished, prior to the seizure of the schooner, and to the extent that said amount enhanced the value of the vessel, as measured by the price obtained at the sale, and that the burden is on the Iron Works to establish, definitely, the amount furnished up to the time of the seizure, and also the extent to which these repairs enhanced the value of the vessel for the purpose of sale."

It is true, as contended, that the voyage was not continued and no freight earned. It is further insisted that it is impossible for the court—

"to find the value of the repairs up to the seizure; that it is incumbent upon the Iron Works to show, by some definite testimony, to what extent the value of the vessel was enhanced, for the purpose of the sale; and that there is no evidence tending to show this."

If this contention be sustained, it necessarily follows that the libel should be dismissed as to the claim for repairs. At the time the contract was made by the master, with the approval of the representative of the owners, no libel had been filed, and the owners and master expected and intended to continue and complete the voyage. The master and crew were retained, under their shipping articles, on the schooner, discharging their duties in accordance with the intention of the owners and themselves to continue such voyage. The officers and employees of the Iron Works were informed, and relied upon the statement of the master and other representatives of the owners, that it was their intention and purpose to put such repairs on the schooner as would enable her to resume and complete her voyage. No objection was made by the marshal nor any of the libelants to the continuation of the work on the repairs.

It would seem too clear to require the citation of authority that, as against the vessel, the reasonable charges for the repairs made upon the schooner, in the light of the facts, in regard to which there is no controversy, constitutes a maritime lien. The Lula, 77 U. S. (10 Wall.) 192, 201, 19 L. Ed. 906; The Dredge A, 217 Fed. 617; The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, 37 L. Ed. 345; The Ulrica (D. C.) 224 Fed. 140. As the repairs were necessary and the charges reasonable, in the absence of any evidence to the contrary, it is a reasonable, if not a necessary, inference that they enhanced the value of the vessel, to the extent of their reasonable cost. It would be to require a burden impossible to carry if the party, under the conditions existing in this case, should be required to show by definite proof the exact amount to which, at some specific period while the work was being done, it enhanced the selling value of the schooner.

The charge for $92.13, which was not approved by the master, and was not a part of, or in performance of, the terms of the original contract, is not allowed as a maritime lien on the schooner. The Wilmington Iron Works makes a charge for wharfage for 77 days at $20 a day. No contest is made as to the claim as a lien. The amount charged is contested. The evidence as to the usual charge for wharfage in Wilmington is contradictory. In the light of the evidence and the conditions under which the schooner was carried to, and remained at, the wharf, a charge of $7.50 a day is, I think, reasonable, amounting to $565.50.

Phillip Shore—For Money and Supplies Advanced to the Master.

[5] Libelant says, in his deposition, referring to the master:

"He asked me to advance this money and act for the vessel, while she was in port, and take care of all his port charges—advance money—to take care

of all his port charges, including all the items that. I have heretofore mentioned in my testimony. He said he was without funds, and that the crew had to be paid and had to be fed, and that the port charges and customs and towage charges had to be provided for before the vessel cleared, and that repairs had to be made and that the supplies must be furnished in order that the vessel could continue her navigation and before she could proceed on her voyage. I told him that I would make the advances, naturally assuming that I would be paid, and believing that I had a lien and first claim against the vessel for the moneys advanced to him and the supplies and repairs furnished to the vessel and all the items I have furnished. * * * I never accepted the drafts in payment for the advances, or any part of them, made by me, or under any agreement that I would look alone to the owners for payment of the drafts, or for payment of the advances by me. I have made no agreement with the owners or master not disclosed in my testimony given to-day."

He further says:

"At the request of the master I drew a draft on November 3, 1920, on R. Lawrence Smith, 17 Battery Place, New York, for the amount, with exchange, $12.50, added."

To this draft he attached a bill for the amount marked paid. It was forwarded to the First National Bank of New York for collection, and after several ineffectual efforts to collect returned unpaid. It has never been paid. The master says that he "expected the owners to pay the amount advanced to him by Phillip Shore." He telegraphed the owners to know if they would honor his draft and they answered that they would. "He [Shore] agreed to look to the owners for his payment."

It is contended by counsel for the Furness Shipping & Agency Company that, upon this evidence the court should find that the money was advanced upon the credit of the owners and not of the schooner. I am unable to concur in this view. There is no evidence that Shore knew the owners, or their financial standing. The fact that at the request of the master, and upon the assurance of the owners to him that they would honor his draft, does not lead to the conclusion that he advanced $5,000 upon their personal credit, when, as he says, he knew he would have a maritime lien which he thought was "the first claim" on the schooner. The conditions represented to him by the master, which were true, brings the advancement clearly within the reason upon which a maritime lien is given. When a vessel is in a foreign port, and now by the Act of June 10, 1912, in her home port, and—

"repairs and supplies are reasonably fit and proper" and "the master, if he has not funds and cannot obtain such on the personal credit of the owners, may obtain the same on the credit of the ship, either with or without giving a bottomry bond, as necessity shall dictate. Reasonable diligence, in either event, must be exercised by the merchant or lender to ascertain that the repairs and supplies were necessary and proper, as the master is not authorized to hypothecate the vessel, unless such was the fact within the meaning of the maritime law." The Lulu, 77 U. S. (10 Wall.) 192, 200 (19 L. Ed. 906).

The case is, in this respect, distinguished from The Avalon (D. C.) 169 Fed. 700. If the person making the advancement, coming within the meaning of the law, acts in good faith and upon reasonable ground, furnish the money or supplies on the credit of the vessel to its master, I do not think that he is bound to see that it is applied to the discharge of claims which constitute maritime liens. Of course, any suggestion of bad faith, collusion with the master, or absence of care to ascertain

the condition of the vessel and her inability to proceed in her voyage, or other condition, essential to the basis of the lien would be fatal to his claim. I find no suggestion of default on the part of Shore in either respect. The Emily Souder, 84 U. S. (17 Wall.) 666, 21 L. Ed. 683; The John L. Lawrence (D. C.) 231 Fed. 507.

In addition to the advance of the $5,000, while the vessel was at Tampa, preparing for her voyage and taking on her cargo, Shore advanced for counsel fees, stevedore bills, pilotage, towage, machinist bills, ship chandler, coal bills, repairing sails and various other amounts described in an itemized statement approved by her master, aggregating $5,959.46. Original invoices and bills for each lien are approved and attached to the statement. The master, on November 23, 1920, gave to Shore a draft on R. Lawrence Smith, of New York, the representative of the owners, which was sent to the First National Bank of New York for collection and was protested for nonpayment. No payment of this amount has been made. The draft was for $5,974.37, which included the exchange. The master testified, and there is no evidence to the contrary, that items in payment of which Shore made the advancements, were necessary for the care of the vessel and to enable her to continue her voyage. The schooner, while at Tampa, engaged a crew and took charge of lumber for Cienfugos, Cuba, by which she earned $15,000 freight. She sailed from Tampa, November 23, 1920.

I do not find anything in the master's testimony contradictory of this statement. If the advancements were made upon the credit of the vessel, the acceptance of the draft, which was dishonored, does not, as a matter of law, or in the absence of an intention to accept them in satisfaction and discharge of the lien, pay the debt or discharge the lien. The Emily Souder, supra. The question of its status with respect to other liens will be postponed for further consideration.

### The Furness Shipping and Agency Company—Advancement of Money and Supplies.

[6] No answer was filed by the owners of the schooner, the original or intervening libelants, to the libel of the Furness Shipping & Agency Company of Rotterdam. The master testifies that the amount of the claim, as set out in the itemized statement attached to the libel, is correct. These items are for advancements made to the master, on the credit of the vessel, coming clearly within the definition of supplies and money to meet necessary expenses incurred while she was at Rotterdam, amounting to 14,454.11 guilders, approximately $5,000 American money.

The contention made by other libelants relates to the question of priority of the lien. This is based upon the suggestion that the claim is within the rules in admiralty "stale." The schooner reached Rotterdam November 27, 1919, with a cargo bound for Oporto, where she delivered a portion of her cargo; the balance she delivered at Cadiz. From Cadiz she went to Norfolk, without cargo, reaching there the latter part of May, going thence to St. Johns, New Brunswick, light; thence to Queenstown; thence to Runcorn, with a cargo. The master says that he sailed from Liverpool to Tampa, reaching there October

28, 1920, light. It is strongly urged by Phillip Shore that the claim of the Furness Shipping & Agency Company should be postponed until his claim is paid; that if the Furness Company had, with due diligence and promptness, enforced its lien, the schooner would have come to Tampa free of liens; that by its laches the lien as against subsequent liens of equal merit was lost or postponed. It will be noted that the Furness Company made advancements extending over a period from November 27, 1919 to January 12, 1920. Its libel is filed March 30, 1921. While more than one year elapsed and the schooner went to several ports, she did not return to her home port. She was at but one American port.

The rule by which liens, of equal merit, are marshaled by the court is not uniform. Much depends upon the conditions and circumstances existing in each case. Brown, District Judge, in the City of Tawas (D. C. E. D. Mich.) 3 Fed. 170, says:

"The subject of marshalling liens in admiralty is * * * left, in great obscurity by the authorities. Many of the rules deduced from the English cases seems inapplicable here. * * * The American authorities * * * are by no means harmonious, and it is scarcely too much to say that each court is a law unto itself."

In that case the court was dealing with liens acquired upon vessels navigating the great lakes. In The Arcturus (D. C.) 18 Fed. 743, Welker, District Judge, discusses the more or less conflicting decisions, reaching the conclusion that the correct view is expressed in Vandewater v. Mills, 19 How. 82, 15 L. Ed. 554, that the maritime lien imports a tacit hypothecation of the subject of it. It is a jus in re without the actual possession, or any right of possession and accompanies the property into the hands of a bona fide purchaser. The 40-day rule in regard to filing libels is confined to vessels "making short trips about the harbor of New York." In The Gratitude (D. C.) 42 Fed. 299, Judge Brown says:

"By the general rule, however, the priority of liens continues only till the next voyage. The liens connected with every new voyage start with a priority over all former ones after the ship has sailed, if there has previously been opportunity to enforce them."

The master says that his shipping articles provided for a voyage and return to Brunswick. In The Buckingham (D. C.) 129 Fed. 975, the vessel began her voyage at Seattle, touching at a number of ports, taking cargoes of different character at several places and returned to Seattle. Judge McPherson says:

"On these facts I agree with the position taken by the proctors, for the Buckingham that the voyage began and ended at Seattle. The charterers' contention that the voyage did not begin until June 10th, when the ship left her last port * * * with a complete cargo, finds.no support in the authorities."

If, as contended by Phillip Shore, a voyage ended and a new one began at each port, where the schooner discharged one and took another cargo, the voyage for the promotion of which he advanced the money and supplies at Tampa came to an end when she reached Cienfugos, discharged the cargo of lumber, and took the cargo of pyrites for Bal-

timore, his position is no better than that of the Furness Company. This definition of the voyage would result in requiring the Furness Company to libel the schooner at Cadiz.

I cannot think this the correct rule. While the term "voyage" is not of a very definite meaning, it would seem that to give practical value to the lien of a person who furnishes supplies to a vessel in a foreign port, the rule should be as stated by Judge McPherson, supra. I do not think that either the Furness Company or Phillip Shore have lost their lien by failing to enforce it before the schooner had completed her voyage, as defined by her shipping articles. Nor do I think that Phillip Shore's rights are affected by his attempt to libel the schooner while she was at Cienfugos. It would seem that the correct rule, under the circumstances, found in this case, is announced by Judge Brown in The J. W. Tucker (D. C.) 20 Fed. 129, that:

"If the liens are of the same rank and for supplies, or materials, or services in preparation for the same voyage, or if they arise upon different bottomry bonds to different holders for advances at the same time, * * * such claims are regarded as contemporaneous and concurrent with each other, and they will be discharged pro rata."

After discharging the liens which have priority, the balance remaining in the registry will be approximately $10,000, to be applied to the claims of Phillip Shore and the Furness Shipping & Agency Company. This amount will be applied to the discharge of these claims pro rata. This, I think, in view of the conceded facts, meets as near as may be, the equities of the case. The libels were, by order of the court, consolidated. The clerk will charge the cost accruing, prior to the order of consolidation, to each of the libelants. The cost accruing subsequently will be paid from the proceeds of the schooner, each libelant paying his own witnesses.

The clerk will make a statement showing amount due on each libel, ascertaining the value in American dollars of the claim of the Furness Shipping Company and the cost for which the Davison Chemical Company and the Diamond Wrecking Company are liable, to be deducted from the amount due them.