**UNITED STATES of America, Libelant,**

v.

**THE Liberty Ship AUDREY II et al., Respondents,**

and

**Universal Oil Carriers, Inc., Claimant, Northwest Marine Iron Works et al., Intervenors.**

**No. 27141.**

United States District Court
N. D. California, S. D.

July 15, 1960.

778

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., Keith R. Ferguson, Sp. Asst. to the Atty. Gen., Graydon S. Staring, Atty., U. S. Dept. of Justice, San Francisco, Cal., for libelant.

Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for intervening libelant Bethlehem Steel Co.

Dorr, Cooper & Hays, San Francisco, Cal., for intervening libelant Northwest Marine Iron Works.

Hall, Henry & Oliver, San Francisco, Cal., for intervening libelants Pacific Gamble Robinson Co., D. H. Girdwood, Grays Harbor-Willapa Harbor Pilots

Ass'n, and North Pacific Shipping Co., Ltd.

Sefton & Gartland, San Francisco, Cal., for intervening libelants Rudolph Blais, Paul R. Ritchie, Francis Falls, and Burrell G. Smith.

Graham, James & Rolph, San Francisco, Cal., for intervenor T. J. Stevenson & Co., Inc.

OLIVER J. CARTER, District Judge.

The matter before the court consists of exceptions taken by the libelant United States of America to the final report of a Special Commissioner in Admiralty. The facts of the case, none of them disputed, are these:

In 1951, the Liberty Ship Audrey II, then the property of the United States, was sold, through the Maritime Administration, to Universal Oil Carriers, Inc., a New York corporation. The purchase price was $544,506, of which $136,176 was paid at the time of the sale. A promissory note, secured by a preferred mortgage on the ship was given for the remaining $408,330, and the vessel was put into operation by Universal. In the course of its operations between February 1953 and May 1954, work was performed for the vessel, and services and materials were supplied to it which gave rise to maritime liens against the ship. The liens pertinent here totalled some $60,000.

Early in 1954, with those liens still undischarged, Universal began failing to make payments on its note to the Government. On May 14, 1954, the Government notified the owners of its election, based on the failure of payment, to make the entire note due and payable, and on August 27, 1954, it filed a libel of foreclosure against the vessel. The Audrey II was then arrested in Los Angeles harbor, and placed in the custody of the United States District Court for the Southern District of California, as authorized by the Ship Mortgage Act, 46 U.S.C.A. §§ 911–984. The vessel then had aboard a cargo of coal which it was under a charter commitment to deliver in Japan. In addition, a time charter had already been negotiated under the terms of which the ship was to be delivered, by September 25, to the Military Sea Transportation Service of the Department of the Navy, in Japan.

On September 1, 1954, libelant United States and respondent Universal Oil Carriers, Inc. entered into a stipulation that the vessel might remain in operation under the custody of the court, and on the same day the court consented to that arrangement. A shoreside custodian was designated to operate as a receiver, and he and the ship's chief mate and chief engineer were appointed Deputy United States Marshals. The jurisdiction of the court thus preserved, the vessel sailed for Japan. It there delivered the cargo of coal and then, after a waiver of the delivery date requirement, began operating under charter to the M.S.T.S. It continued to sail under that charter, as amended, until June, 1955.

In November, 1954, however, after repeated failures by Universal to pay suppliers and the crew, it became clear that the vessel, then in Yokohama and all but abandoned by its crew, was inoperable under Universal's management and in immediate need of new capital resources. The Government then secured a court order, dated November 18, 1954, which set out in its findings the following:

"It Appearing To The Court And The Court So Finding from said affidavit and said exhibits attached hereto that immediate action is necessary to maintain said vessel and save said vessel from deterioration and damage, that the offer of the libelant, through its agency, the Maritime Administration, to advance monies for the operation and maintenance of said vessel and the maintenance of proper insurance and the payment of the wages of the crew and allotments to their families should be accepted, and that T. J. Stevenson & Co. should be appointed as Shoreside Custodians Agent with directions to operate and maintain said vessel in the

manner customarily followed by good ship operators, and that such advances made by the Maritime Administration up to a sum of $150,000.00 should constitute a lien on said vessel for its maintenance and operation and be repayable out of revenues received from the operation of said vessel and/or in the event of sale from the proceeds of such sale. * * * "

The findings were followed by an order which appointed the Stevenson Co. operating agent for the shoreside custodian, and directed that the custodian accept from the Maritime Administration "advances up to the sum of $150,000 and that such advances so received * * shall constitute and be a lien on said vessel Audrey II for her maintenance, protection and operation and repayable out of revenues from the operation of said vessel. * * * "

Pursuant to that order, the Maritime Administration advanced a total of approximately $142,000 to the custodian during November and December, 1954. Its debts thus paid and its operating expenses thus provided for, the vessel remained in service until June, 1955, when it returned to the United States and was laid up prior to sale.

On the arrest of the vessel in August, 1954, notice had been duly published. No parties had then appeared to assert any claims or to oppose the court orders concerning the ship. On its return to the United States for sale in June, 1955, however, six claimants came forward to file intervening libels. Each new libelant held a lien or liens against the vessel for materials or services supplied during the period February, 1953 through May, 1954. All of these liens had thus arisen prior to the Government's libel.

On June 10, 1955 this court accepted transfer of the matter in an order confirming what was termed the "preferred maritime lien" created by the Government's advances. Subsequently, the court ordered the sale of the vessel, and accordingly it was sold, on August 2, 1955, for the sum of $430,000.

That amount was not large enough to provide payment to the Government for the principal and interest due on the mortgage, and at the same time to discharge the liens of both the Government and the intervenors. To establish the proper priority of payment, therefore, and to resolve other issues not here relevant, a Special Commissioner was appointed. His final report, filed March 7, 1958, awarded to the liens of intervenors priority over the Government's claim for its advances. To that determination the Government has taken exception.

Under the terms of Admiralty Rule 43½, 28 U.S.C., the Commissioner's report is "presumptively correct," but it is subject to review, and may be modified or rejected, "when the court in the exercise of its judgment is fully satisfied that error has been committed * * * " The Government asserts here that the Commissioner's award of priority to the intervening claims was clearly erroneous, and advances a number of reasons for so finding. Under the view here taken, only one of the Government's contentions need be considered.

■ If the advances granted by the Maritime Administration achieved the status of liens, they take priority over the liens of intervenors. This is so because, having been necessary for the maintenance of the vessel and for the payment of its crew, the advances would give rise to liens occupying a rank at least equal to that of intervenors' liens for provisions, services and repairs. And the general rule is that maritime liens of the same rank take priority in an order inverse to that in which they accrued, the latter taking precedence over the earlier. The St. Jago de Cuba, 1824, 9 Wheat. 409, 416, 22 U.S. 409, 416, 6 L.Ed. 122: "The vessel must get on; this is the consideration that controls every other. * * * " The Commack, D.C.S.D. Fla.1925, 8 F.2d 151.

■ All the liens of intervenors arose prior to the voyage which called forth the

government's advances. It is therefore clear that those advances, if a maritime lien arose from them, must take precedence over the claims of intervenors. Todd Shipyards Corp. v. The City of Athens, D.C.D.Md.1949, 83 F.Supp. 67.

The Commissioner found that the advances did not give rise to a lien. He based his finding on the *in custodia legis* doctrine, which preclude the attachment of a lien to vessels in the custody of a court. The Commissioner recognized that the rule is subject to a number of exceptions.

The cases which adopt the rule uniformly reflect the purpose behind it. No lien is permitted to arise because the vessel's owners, having been denied further control in order to protect and satisfy existing rights of other parties, cannot be granted a continuing power to compromise those rights through the creation of new obligations on the vessel. See The Bethlehem, D.C.E.D.Pa.1923, 286 F. 400; The Nisseqogue, D.C.E.D. N.C.1922, 280 F. 174; The Rupert City, D.C.W.D.Wash.1914, 213 F. 263. But no case cited to the court, nor any case the court has been able to find, presented a challenge to the lien status of an expense authorized by the custodial court itself. Here, the authority which had assumed control of the vessel in the interest of all parties concerned not only authorized the expense in advance, but itself specifically awarded the rank of lien to the debt thus incurred. No reason suggests itself for applying a rule devised to protect unrepresented parties so as to invalidate an order which was framed by their guardian, which was plainly reasonable under the circumstances, and which was made on notice to all parties known to be interested, none of whom objected.

■ A custodial court has the power to create a lien for services rendered pursuant to the court's direction, and cases dealing with custodial expenses suggest that such a power does exist. The Nisseqogue, supra, quoted the language of The Esteban de Antunano, C.C.E.D.La. 1887, 31 F. 920, 924: "While the ship was in the custody of the law, it is doubtful whether, on any account or for any service (except, perhaps, for salvage, or through a collision), any lien could arise on the ship; certainly not without the express authority of the court having the property in possession." [280 F. 184.] The Willamette Valley, 9 Cir., 1895, 66 F. 565, 568, puts the position more affirmatively. There a vessel in receivership which had been permitted to remain in operation incurred indebtedness for coal. The District Court, 62 F. 293, found that a lien had arisen, and the Court of Appeals for this circuit affirmed, holding that when a vessel's master had no funds for the purchase of fuel, "It must be presumed to have been the intention of the receiver, and of the court whose officer he is, to procure such supplies upon the vessel's credit, and to subject her to the usual maritime lien therefor."

■ The custodial court must have the power to incur debts and to guarantee their repayment. New York Dock Co. v. The Poznan, 1927, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955, holds that wharfage fees incurred during the custodial period with the tacit consent of the marshal but without an authorizing order from the court were entitled nonetheless to preferential payment. "The most elementary notion of justice would seem to require that services or property furnished upon the authority of the court or its officer, acting within his authority, for the common benefit of those interested in a fund administered by the court, should be paid from the fund as an 'expense of justice.'" 274 U.S. at pages 120, 121, 47 S.Ct. at page 484.

It is clear that not only must custodial courts be deemed capable of creating liens, but that the *in custodia legis* doctrine has never been applied so as to produce the kind of result contended for here by intervenors. Courts have commonly approved liens arising during the custodial period when approval seemed equitable. Both The Nisseqogue and The Willamette Valley, supra, and The Young America, D.C.S.D.N.Y.1887, 30

F. 789 honored claims for liens so incurred. In all three cases the vessel involved had been permitted to remain in operation, and persons having no knowledge of its custodial status had relied on its credit in furnishing supplies. The courts respected the reasonable reliance of suppliers whose granting of credit had enabled the vessel to continue operating. This case is little different. Here, the Maritime Administration well knew of the vessel's custody, but its advances were as necessary to the ship as the supplies in the cases cited, and it did not act until those advances appeared to be fully protected by an order of the custodial court.

■■ Continued operation after libel is a practice authorized by 46 U.S.C.A. § 952, and not uncommonly adopted.[1] Operation was sanctioned here also by the terms of the ship's mortgage, under which was brought the libel of which intervenors had notice. The continued operation of the vessel subjected the unknown interests of intervenors only to the same risk they had run before the seizure: the ordinary and continuous risk faced by holders of maritime liens that later liens, of higher priority, might attach. There is no basis for finding the government's action to have been taken in bad faith which would justify this court in nullifying the order which approved and protected the subsequent advances.[2]

The order of November 18, 1954, being therefore valid, and binding on all parties here, the claims based on the government's advances must take precedence over the liens of intervenors.

■ The court further finds that the allegations set out in the petition under Admiralty Rule 42 of Seaman Harry Francis Corbett, Jr., being admitted by the libelant, create a claim of first priority for that petitioner's wages, due in the amount of $320.80.

Proctors for libelant will prepare a final decree.

1. See the consent orders of May 6, 1953, in United States v S.S. Seven Seas, D. C., 111 F.Supp. 294; of August 6, 1953, in United States v. S.S. Lewis Emery, Jr., Adm. No. 26578; of August 10, 1953, in United States v. S.S. Coe Victory, Adm. No. 26586; of September 14, 1953, in United States v. Cocur d'Alene Victory, Adm. No. 26613; United States v. S.S. Mankato Victory, Adm. No. 26626, of this court.

2. While the court has considered the status of intervenor's claims, it should be noted that even if the order were erroneous, it would be beyond the power of intervenors to attack here. Like all other parties they are bound by it. Notice of the government's libel was published on September 2, 1954, more than two months before the advances became necessary. None of the intervenors responded to the libel then or at any time thereafter until the Audrey II returned to the United States in the following year. On September 20, 1954, proclamation had been made and the default entered of all parties other than the vessel's owners. Intervenors argue that their failure to respond precluded only a challenge to the government's claim under the mortgage, which they do not here contest. But in fact that failure had additional significance. Since continued operation of a vessel is always possible after libel, and since maritime liens are "secret" or unpublished liens, a failure of lienholders to appear before a custodial court in response to a notice of libel deprives that court of its opportunity to determine the conditions of future operation of the vessel with full knowledge of all liens against the vessel. Parties intervening cannot challenge any prior order, but must accept a proceeding just as it stood when they entered it. Cf. Galbreath v. Metropolitan Trust Co., 10 Cir., 1943, 134 F.2d 569; Rector v. United States. 8 Cir., 1927, 20 F.2d 845; Commercial Electrical Supply Co. v. Curtis, 8 Cir., 1923, 288 F. 657. Here, the order sought to be attacked was not on its face unreasonable or arbitrary; it was not opposed by any party before the court; and it could operate to compromise the possible rights of unknown, later intervenors only in the same manner and to the same extent that those rights had been open to compromise before the libel had been filed.